PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.

JEREMY SANQUAN WRIGHT,

  *Defendant-Appellant.*

No. 08-4679

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Terry L. Wooten, District Judge.
(4:07-cr-00897-TLW-1)

Argued: December 2, 2009

Decided: February 3, 2010

Before WILKINSON, GREGORY, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Duncan joined. Judge Gregory wrote
a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: David Bruce Betts, Columbia, South Carolina,
for Appellant. Carrie Ann Fisher, OFFICE OF THE UNITED
STATES ATTORNEY, Florence, South Carolina, for Appel-

lee. **ON BRIEF:** W. Walter Wilkins, United States Attorney, Columbia, South Carolina, Alfred W. Bethea, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Florence, South Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Jeremy Wright sprayed twenty-two rounds from an AK-47 assault rifle into a crowded night club parking lot, killing a man sleeping in a car with a single bullet to the head. Wright fired his rifle until he ran out of ammunition even though there were some two or three hundred people at the club, many of whom were pouring outdoors as the result of a fight that Wright had just instigated with rival gang members. In addition to the man he killed, Wright also wounded a club patron in the course of his rampage.

A jury convicted Wright of being a felon in possession of a firearm under 18 U.S.C. § 922(g). In light of his prior offenses, the district court sentenced Wright to life imprisonment under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). We affirm.

I.

On the night of June 17, 2007, appellant Jeremy Wright, his brother, Brandon Wright, Atari Hayes and Geno (last name unknown) were at the Grand Prix Night Club in Dillon County, South Carolina. Wright was a member of the Crips street gang, and his friends also were affiliated with the organization. After some time at the Grand Prix, the men decided to go to the Blue Moon Night Club and set off in a convoy of three cars with other associates.

When they arrived in the parking lot outside the Blue Moon, the owner of the club, Randy McCullum, informed Wright that he and his friends were not welcome because some of them had caused problems at the club a week earlier. Wright demanded entry. During the ensuing altercation, Wright told McCullum, "If we can't go in and par[ty], nobody can par[ty]." According to one bystander, Wright said that "if he can't come in the club, he didn't want nobody in the club, he would turn it out. He didn't want nobody going in the club." The argument grew heated. One witness said that Wright three times ordered the driver of the car in which he arrived to pop the trunk, which later events showed to contain a firearm. The driver refused. One of the night club workers testified that Wright told McCullum, "Your nephew killed our home boy; we owe you all a body."

After issuing these threats, Wright, Hayes, and Geno pushed past McCullum and entered the night club, with Wright refusing to be searched by the bouncer at the door. Almost immediately, Wright became involved in a fight with an individual whose red bandana and red hat marked him as a member of the rival Bloods gang. While the club's bouncer was attempting to end this brawl, two more fights broke out, one of which involved Geno on one side and a Bloods member on the other. Hayes managed to leave the building and told Brandon Wright that his brother was fighting inside.

Brandon Wright went to the back of the car the men drove to the night club and removed an AK-47 assault rifle from the trunk. The gun itself was never recovered, but several witnesses at trial identified pictures of the type of gun and noted that it had a banana clip. While Brandon Wright was getting the gun, Jeremy Wright and the patrons of the club were spilling out the front door, and the club employees were trying to end the fighting. A man yelled at Brandon to put the gun away. Brandon began to obey, but Jeremy Wright snatched the AK-47 from his hands. He cocked the gun, walked to the

door of the night club, and pointed the AK-47 inside. He then turned and started shooting into the parking lot.

Wright fired repeatedly, continuing to shoot until he expended all his ammunition and the gun clicked on an empty chamber. One of his victims, Jameka Manning, testified that she heard "real, real loud gun noises. And I could hear the bullets flying by my face and could feel, like, the wind pass by my face." After being narrowly missed by several rounds, she was struck in the back by a bullet. Investigators later recovered twenty-two 7.62 x 39 mm shell casings, the same caliber ammunition fired by the AK-47.

After firing all his ammunition, Wright ran back to the car, and he and his friends left. As they were leaving, Hayes heard a girl screaming, "He's shot, he's shot, he's dead." Wright told his friends not to "snitch" because he would get back at them. The men went back to the Grand Prix Night Club. Several minutes after Wright left, witnesses reported that other individuals began firing guns. However, all agreed that the AK-47 had a distinctive sound and that the later shots were from different types of weapons.

Police responding to a 911 call from the Blue Moon found Kelvin Small dead in the back seat of his car with a gunshot wound to the back of his head. Small had been sleeping in his car when he was killed. Bullet fragments recovered from Small's body were examined by a forensic scientist and determined to be most consistent with a 7.62 x 39 mm bullet.

A jury found Jeremy Wright guilty of possessing a firearm after being previously convicted of a felony. 18 U.S.C. § 922(g)(i). After the jury was excused but while the trial judge remained on the bench, Wright jumped from his chair and headed for the prosecutor's table with clenched fists. He was subdued by U.S. Marshals before any injury occurred.

Wright's presentence report listed numerous prior incidents, including an aggravated assault and battery conviction

arising from a gang fight between Crips and Bloods. In addition to that conviction and other criminal acts not relevant here, Wright had three juvenile adjudications stemming from three separate burglaries in the year 2000, in which Wright stole a 9mm handgun, an FKS rifle, and a .32 New England Firearms Model R73 Revolver. Based on these prior offenses, the district court sentenced Wright under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), to life imprisonment.

On appeal, Wright raises three challenges to his sentence. He first argues that the use of his juvenile adjudications as predicate crimes under the ACCA violates the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), because South Carolina family courts do not employ juries.[1] Second, Wright claims that the burglaries he committed as a juvenile do not qualify as violent felonies under the ACCA because he did not "carry" firearms merely by stealing them. Finally, Wright asserts that the district court improperly referenced the sentencing guideline for first degree murder when it sentenced him. We consider each of these arguments in turn.

## II.

## A.

We review *de novo* Wright's claim that the Armed Career Criminal Act (ACCA) enhancement he received on the basis of his juvenile adjudications was improper. Wright was convicted by a jury of violating 18 U.S.C. § 922(g), which prohibits any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] . . . any firearm or ammunition." As

---

[1]South Carolina does not have separate juvenile courts but instead gives its family courts exclusive jurisdiction to adjudicate most juvenile offenses. *See* S.C. Code § 63-3-510.

a result of this conviction, Wright was subject to a statutory maximum sentence of not more than ten years. *See* 18 U.S.C. § 924(a)(2). However, in recognition of the fact that certain repeat offenders pose a greater risk than other criminals, Congress has chosen through the ACCA to increase the punishment for any "person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony or a serious drug offense, or both." 18 U.S.C. 924(e)(1). Offenders who meet § 924(e)(1)'s criteria are subject to a statutory minimum of fifteen years' imprisonment. *Id.*

Wright's adult conviction for aggravated assault and battery plainly counts as one of the required three predicate violent felony convictions. *See* 18 U.S.C. § 924(e)(2)(B)(i) ("violent felony" includes any adult conviction punishable by more than one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another"). Similarly, the three burglaries for which Wright was adjudged delinquent as a juvenile fall within § 924(e)'s violent felony definition. The relevant statutory provisions state that any burglary that is an "act of juvenile delinquency involving the use or carrying of a firearm . . . that would be punishable by imprisonment for [a term exceeding one year] if committed by an adult" constitutes a violent felony. 18 U.S.C. § 924(e)(2)(B).

Wright argues that, notwithstanding this language, his juvenile adjudications cannot be counted under the ACCA because South Carolina family courts do not employ juries. He asserts that these adjudications are infirm on their face. He further argues that the district court violated the Supreme Court's statement in *Apprendi v. New Jersey* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Under Wright's view, the district court violated *Apprendi* by considering his juvenile adjudications in applying § 924(e).

### B.

The Supreme Court's decision in *McKiever v. Pennsylvania*, 403 U.S. 528 (1971) (plurality opinion), squarely forecloses Wright's challenge to the use of his juvenile adjudications at sentencing. While the decision was a plurality, five justices rejected Sixth Amendment challenges to several juvenile delinquency proceedings, holding that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *Id.* at 545 (plurality opinion); *id.* at 557 (Harlan, J., concurring in the judgments). Part of the plurality's concern was that a jury requirement would undermine the unique rehabilitative, if imperfectly realized, goals of the juvenile justice system. *See*, *e.g.*, *id.* at 543-45, 47. "If the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial." *Id.* at 550. As a jury is not required in a juvenile adjudication on the merits, we see no reason to impose such a requirement through the back door by allowing former juveniles who have subsequently reached adulthood to overturn their adjudications in subsequent sentencing hearings.

This is not to say that a juvenile is without protection. Rather, juveniles are accorded many other procedural safeguards, for instance "the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against self-incrimination [in addition to] proof beyond a reasonable doubt." *Id.* at 533. However, there is no reason to hold that an adjudication that is constitutionally sufficient to commit a juvenile to confinement, in some instances until age twenty-one, is somehow off limits for sentencing consideration if the same juvenile later violates § 924(e)'s armed career criminal prohibition. The Supreme Court has decided that juries are not required in juvenile proceedings, and it is not for us to set aside that ruling.

In light of this guidance, it is not surprising that the clear majority of circuits to consider this issue agree that juvenile offenses may be considered by the court as predicate convictions at ACCA sentencings. Four circuits have held that juvenile convictions fall within *Apprendi's* exemption for prior convictions and need not be submitted to a jury. *See U.S. v. Smalley*, 294 F.3d 1030, 1033 (8th Cir. 2002) ("We therefore conclude that juvenile adjudications can rightly be characterized as 'prior convictions' for *Apprendi* purposes, and that the district court did not err in increasing [the defendant's] sentence based on his prior juvenile adjudications."); *U.S. v. Crowell*, 493 F.3d 744, 749-51 (6th Cir. 2007) (same); *U.S. v. Burge*, 407 F.3d 1183, 1187-91 (11th Cir. 2005) (same); *U.S. v. Jones*, 332 F.3d 688, 696 (3d Cir. 2003) (same). *But see U.S. v. Tighe*, 266 F.3d 1187, 1191-95 (9th Cir. 2001). Several state courts have taken the same route. *See State v. Hitt*, 42 P.3d 732, 739-40 (Kan. 2002); *Ryle v. State*, 842 N.E.2d 320, 321-23 (Ind. 2005); *People v. Bowden*, 102 Cal. App. 4th 387, 125 Cal. Rptr. 2d 513 (Cal. Ct. App. 2002). *But see State v. Brown*, 879 So. 2d 1276, 1290 (La. 2004).

These courts have recognized that the issue of whether juvenile adjudications can be used to enhance sentences under *Apprendi's* exception for prior convictions hinges in part on whether non-jury adjudications "are so reliable that due process of law is not offended by such an exemption." *Smalley*, 294 F.3d at 1033. Thus, many courts have held that prior convictions are allowed to enhance punishment under the ACCA without being "submitted for jury consideration because 'the defendant has received the totality of constitutional protections due in the prior proceeding on the predicate offense.'" *Burge*, 407 F.3d at 1191 (quoting *U.S. v. McGatha*, 891 F.2d 1520, 1526 (11th Cir. 1990)). As the Eighth Circuit explained, "[W]hile we recognize that a jury does not have a role in trials for juvenile offenses, we do not think that this fact undermines the reliability of such adjudications in any significant way." *Smalley*, 294 F.3d at 1033.

As the ACCA expressly provides for qualifying juvenile adjudications to be used as predicate offenses and the Constitution in no way forbids it, the district court was correct not to discount the fact that Wright burgled firearms on three separate occasions during his delinquent youth. The fact that juries are not constitutionally required in juvenile adjudications does nothing to impeach this fact. As a result, we agree with the Sixth Circuit that the "defendant received all process that was due when convicted – for adults that includes the right to a jury trial; for juveniles, it does not." *Crowell*, 493 F.3d at 750 (citing *Jones*, 332 F.3d at 695)). The district court properly relied on Wright's prior juvenile convictions to enhance his sentence under the ACCA.[2]

## III.

We next move to Wright's contention that his juvenile burglaries do not constitute prior offenses under the ACCA

---

[2]Only two days before oral arguments in this case, Wright's counsel filed a supplemental brief addressing our decision in *United States v. Walters*, 359 F.3d 340 (4th Cir. 2004), to argue that the fact that juvenile adjudications are not considered criminal convictions under South Carolina law renders consideration of such convictions inappropriate for ACCA purposes. Because this argument is distinct from Wright's *Apprendi*/Sixth Amendment claim and was not raised until literally hours before oral argument on appeal, we hold that it was waived. Even if we were to entertain this new argument, however, we would have to reject it. *Walters* decided that an individual previously adjudicated a delinquent who possessed a firearm could not be convicted as a felon in possession under § 922(g)(1) because Virginia state law distinguishes juvenile adjudications from criminal convictions. *Walters*, 359 F.3d at 344-47. South Carolina law contains a similar provision. *See* S.C. Code § 63-19-1410(C). However, unlike § 922(g)(1), which by its terms only applies to convicted adult felons, the ACCA specifically indicates that not only prior felonies but also prior juvenile adjudications involving the use or carrying of firearms may be considered. *See* § 924(e)(2)(B). Indeed, *Walters* itself discussed this distinction. *See Walters*, 359 F.3d at 343. Thus the statutory treatment of juvenile adjudications under the ACCA is distinct from juvenile offenders' treatment under § 922(g)(1)'s felon in possession prohibition, and the *Walters* opinion does not aid appellant here.

because he did not "carry" a firearm while committing a crime of violence. This claim is also a legal one and thus is reviewed *de novo*. *U.S. v. Williams*, 508 F.3d 724, 726 (4th Cir. 2007). As noted, 18 U.S.C. § 924(e) enhances the sentences of repeat violent felons who possess firearms in violation of 18 U.S.C. § 922(g). In the case of juveniles, a burglary "involving the use or carrying of a firearm" qualifies as a prior violent offense. 18 U.S.C. § 924(e)(2)(B). The practical effect of counting Wright's burglaries as predicate ACCA convictions is to increase his statutory sentencing range from a maximum sentence of ten years to a mandatory minimum of fifteen years with no statutory ceiling. *Compare* 18 U.S.C. § 924(a)(2) *with* 18 U.S.C. § 924(e)(1).

Wright argues that the act of burglary is complete at the moment a dwelling is entered without consent. He thus claims that his burglaries did not involve carrying firearms because it is possible to commit burglary simply by entering a dwelling with the requisite intent to commit a crime, regardless of whether anything is actually stolen. *See* S.C. Code § 16-11-312(A). Additionally, he points out that with each of his three burglary convictions he was also convicted of a corresponding count of larceny under South Carolina Code § 16-13-30. Because Wright contends that *these* convictions punish the actual carrying of the firearms he stole, he argues that the burglary convictions do not meet the ACCA's requirement that a firearm be carried in the commission of a burglary.

We cannot accept this argument. To begin, we note that Wright does not dispute that he committed three burglaries as a juvenile and that in each instance he stole a firearm. He does not raise any argument that the convictions were somehow unreliable under *Shepard v. United States*, 544 U.S. 13 (2005). Rather, the only question is whether as a definitional matter Wright "carried" firearms when he admittedly stole them from homes on three separate occasions.

We explained only recently in *United States v. Thompson* that burglary is a crime of violence under the ACCA, pro-

vided that it meets the general requirements set out in *Taylor v. United States*:

> the Supreme Court has construed 'burglary' in the statute to include 'any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.'

588 F.3d 197, 200 (4th Cir. 2009) (quoting *Taylor v. U.S.*, 495 U.S. 575, 599 (1990)).

In this case, the law Wright violated as a juvenile states that "[a] person is guilty of burglary in the second degree if the person enters a dwelling without consent and with intent to commit a crime in the dwelling." S.C. Code § 16-11-312(A).[3] This language tracks the generic definition of burglary set forth by the Supreme Court in *Taylor*, and as such we have no difficulty determining that South Carolina's burglary statute falls within the ACCA's list of prior offenses.

Wright's further arguments serve only to confirm our view. His claim that he did not "carry" firearms falls short. Section 924(e) merely requires that a prior offense be one "*involving* the use or carrying of a firearm." 18 U.S.C. § 924(e)(2)(B) (emphasis added). The language "involving the use or carrying of a firearm" is broader than language such as breaking and/or entering with firearms—a formulation Congress could have used but did not. The statute does not define "involving," but that term in no way narrows its "use or carrying" language. Indeed, in defining the same word in another prong of

---

[3]It appears that Wright was initially charged with two counts of first degree burglary, S.C. Code § 16-11-311, and one count of second degree burglary, S.C. Code § 16-11-312, but that he was allowed to plead guilty to three counts of second degree burglary. *See* J.A. 189, 211-18. *See also* Br. of Appellant 11 n.1.

§ 924(e), we have already acknowledged that "involving" means "[t]o have as a necessary feature or consequence" and that "the word 'involving' itself suggests that the subsection should be read expansively." *U.S. v. Brandon*, 247 F.3d 186, 190 (4th Cir. 2001) (interpreting 18 U.S.C. § 924(e)(2)(A)(ii)) (emphasis omitted in first quotation). A burglary that results in the theft of firearms necessarily involves carrying them, else the burglar would be forced to leave his spoils at the scene of the crime.

This notion is consistent with our interpretation of other sections of 18 U.S.C. § 924 as well. For instance, in *United States v. Mitchell*, we noted that the "plain meaning of the term 'carry' as used in § 924(c)(1) requires knowing possession and bearing, movement, conveyance, or transportation of the firearm in some manner." 104 F.3d 649, 653 (4th Cir. 1997). Relying on this language, the district court in the present case correctly held that "taking the gun during the burglary . . . does involve a carrying of the gun, and that does involve a possession and bearing, movement, conveyance or transportation of the firearm." Wright knowingly possessed and transported a firearm contemporaneously with and as a consequence of each of his three burglaries. As a result, he cannot now be heard to argue that his crimes did not involve the carrying of firearms. Additionally, by stealing firearms Wright armed himself with a deadly weapon that furthered his escape. Whether he intended to do so is irrelevant; the firearms were available to aid his flight from justice as soon as he took possession of them.

Indeed, South Carolina courts have taken a similar view in interpreting an element of the state's first degree burglary statute that requires a suspect to be "armed with a deadly weapon." S.C. Code § 16-11-311(A)(1)(a). In affirming a burglary conviction in which a loaded .22 caliber rifle was stolen, the South Carolina Court of Appeals explained that a defendant or his accomplice "need only have physical control over a deadly weapon . . . such that the weapon is readily available

for the person to use. It matters not how the person acquired the deadly weapon or for what purpose the person took possession of the deadly weapon." *State v. McCaskill*, 468 S.E.2d 81, 82 (S.C. Ct. App. 1996). It is simply inaccurate to say that Wright did not use or carry firearms when he carried them from the homes he burgled. At the moment he stole them, they became "just as available . . . for offensive or defensive use as if the burglar had himself brought the weapon to the burglary for the purpose of committing the crime." *Id.* at 83. The district court properly rejected Wright's argument to the contrary.

IV.

Wright's final claim on appeal is that the district court erroneously cross-referenced the sentencing guideline for first degree murder instead of the second degree guideline. Following the Supreme Court's decision in *Gall v. United States*, we must "ensure that the district court committed no significant procedural error," when it calculated the guidelines range. 552 U.S. 38, 51 (2007). If the guidelines range is properly calculated, we review the substantive reasonableness of the sentence under an abuse of discretion standard. *Id.* When, as here, the sentence is within the calculated guidelines range, an "appellate court may, but is not required to, apply a presumption of reasonableness" to the sentence imposed. *Id.*

As Wright's counsel acknowledged at argument, our resolution of Wright's ACCA claims undermines his objection to the district court's advisory guidelines calculation. Even the second degree murder range Wright claims should have been used would have dictated a range of 360 months to life. Br. of Appellees 21 n.3.

However, the district court did not err by referring to the first degree murder guideline. It began by applying U.S.S.G. § 2K2.1, which deals with sentencing for unlawful possession of firearms. However, § 2K2.1(c)(1) instructs a court to apply

a cross reference if a defendant who unlawfully possessed firearms used them to commit any other crimes. The district court thus applied the sentencing guideline for first degree murder, U.S.S.G. § 2A1.1, which gives a base offense level of 43 and a recommended life sentence.

The district court did not err in its determination that first degree murder was the appropriate cross reference for Wright's firearm violation. Indeed, the court's decision is consistent with the substantive definition of first degree murder:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . any . . . kind of willful, deliberate, malicious, and premeditated killing . . ., is murder in the first degree. Any other murder is murder in the second degree.

18 U.S.C. § 1111(a). It is not necessary that the defendant intend to kill the specific individual who dies. Any killing which was "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed" is covered by the statute. *Id.* Similarly, it is well settled that "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." *U.S. v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 950 (2009).

Here, many facts support the view that Wright behaved willfully, deliberately, maliciously, and with premeditation. Wright and his fellow Crips were denied entry to the Blue Moon Night Club precisely because some of them had been involved in prior fights with rival Bloods. After being told he could not enter the club, Wright threatened mahem, vowing to prevent anyone from patronizing the club if he and his

friends were refused entrance. The intimidation took on a sinister character, one witness testifying that Wright threatened club owner McCullum, saying, "Your nephew killed our home boy; we owe you all a body."

Wright and two friends then pushed into the bar, where Wright immediately put his threats into action, picking a fight with a rival Bloods member. Other fights broke out, and the patrons of the club streamed out into the parking lot. Wright's brother, hearing Wright was in a fight, pulled the AK-47 from the car trunk but then began to put it back when a bystander yelled at him. Before he could do so, Wright, fresh from his fight with a rival street gang member, snatched the AK-47 and opened up on the chaotic scene. The district court recognized at sentencing that "Mr. Wright had been in some kind of confrontation, he had a motive to fire the gun, and fired it, and if someone was killed, so be it." Indeed, Wright stopped firing only after he emptied his magazine, gunning down an innocent man in the process.

It was perfectly foreseeable that someone would be killed when Wright sprayed the parking lot with gunfire. Cars do not drive themselves. People ride in them, wait in them, and cross parking lots to get to them. It was thus not at all unusual that Kelvin Smalls was in a car that Wright fired into, nor, unfortunately, was it surprising that Wright's shot resulted in Small's killing. As the trial court found, Wright engaged in "a reckless firing of the firearm, a random firing *with the intent to hurt someone.*" (emphasis added).

In addition, Jameka Manning's testimony certainly does nothing to dispel the district court's determination. Manning was shot in the back by Wright, and before being hit, she heard several other bullets fly close by her body, so close that she could feel the wind from their passing. Whether her shooting was intentional or random is hardly the point, for the district court's determination did not depend on whether Wright's marksmanship wholly matched his malice. The dis-

trict court properly applied the first degree murder cross reference.

Because we find the district court calculated the guideline correctly, we next exercise our discretion under *Gall* to "apply a presumption of reasonableness" to the within-guidelines sentence imposed here. 552 U.S. at 51. Far from being an abuse of discretion, the district court's decision to impose a life sentence is well-supported by the sad facts of this case.

In the final analysis, Wright made at least twenty-two deliberate choices the evening he ended Kelvin Small's life. He decided to empty twenty-two 7.62 x 39 mm rifle rounds from his AK-47 into a crowded parking lot. Tragically, one of Wright's decisions ended with a bullet embedded in Small's skull. The district court did not err in sentencing Wright to life in prison. The sentence was reasonable in light of Wright's instant offense, his adult conviction for aggravated assault and battery, and his three prior convictions for burglary of firearms from residences. This conduct is the sort at which the Armed Career Criminal Act is aimed, and we affirm the judgment.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

While I concur with the majority's opinion finding that Wright was appropriately categorized as an armed career offender under the Armed Career Criminal Act, I respectfully dissent from Part IV, which denies Wright's claim that the district court erred when it applied the sentencing guideline for first degree murder. Under *Gall v. United States*, 552 U.S. 38, 51 (2007), we "must first ensure that the district court committed no significant procedural error." I find that the court's cross reference to first degree murder resulted in an erroneous calculation of the guidelines.

While reckless behavior, as cited by the district court and the majority, may be sufficient to show malice aforethought, there must be evidence that the killing was "willful, deliberate, . . . and premeditated" for murder to rise to the level of first degree. *See* 18 U.S.C. § 1111(a). In this case, no evidence, and certainly not a preponderance of the evidence, demonstrates that Wright held a premeditated design to effect the death of *any person*. There is no evidence that Wright knew that the cars he was firing toward were occupied or that Wright consciously intended to bring about the death of any person at the scene, thus causing Smalls' death. Instead, as the district court recognized, Smalls "happened . . . to be in the vicinity" when Wright engaged in a "reckless" and "random firing." J.A. 163-64. No one testified that Wright was shooting at any individual. To the contrary, the evidence shows that Wright "didn't open fire in the club" and was shooting "towards the cars" parked in the lot. J.A. 56, 106-07. One witness specifically stated that Wright was aiming at a green car to shoot it up and agreed that Wright was not shooting at persons. J.A. 75, 83. Another witness testified that Wright was shooting directly in front of a green truck, belonging to the club owner McCullum. J.A. 58. McCullum was the individual who told Wright he could not enter the club.

While the facts of this case are tragic and Wright's conduct was certainly reckless, whether the conduct constituted first degree murder depends on whether Wright acted purposefully and not simply whether Smalls' death was foreseeable. Foreseeability, as cited by the majority, is relevant to second degree murder, but it is not a component of first degree murder, which requires a specific, subjective state of mind. First degree murder requires that Wright had the purposeful intent to bring about a death. So while it may have been reasonable for Wright to realize that people might be in the parking lot that night, this alone is not evidence that Wright committed a "willful, deliberate, . . . and premeditated" killing. If the evidence had shown that Wright was shooting at anyone with the intent to kill, including the injured bystander, Jameka Man-

ning, I would agree with the majority's analysis. Such evidence, however, does not exist on this record.

Therefore, the district court's finding in favor of its cross reference of first degree murder is not supported by a preponderance of the evidence and is clearly erroneous. The resulting error was not harmless because the cross reference to first degree murder, "absent any downward adjustments or departures, require[d] the district court to impose a life sentence." *United States v. Crump*, 120 F.3d 462, 467 n.3 (4th Cir. 1997). The court should have cross-referenced second-degree murder, which given Wright's criminal history category of VI, would have provided a guideline range of 360 months to life. Thus, although Wright would have been eligible for a life sentence, such sentence should not have been required. Consequently, I would vacate the district court's sentence and remand for resentencing.