**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-4626

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TIMOTHY JAMES POOLE,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Florence.  R. Bryan Harwell, District Judge. (4:09-cr-00531-RBH-1)

Argued:  September 21, 2011          Decided:  October 20, 2011

Before DUNCAN and AGEE, Circuit Judges, and Damon J. KEITH, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Affirmed by unpublished opinion.  Judge Duncan wrote the opinion, in which Judge Agee and Senior Judge Keith joined.

**ARGUED:** Jonathan McKey Milling, MILLING LAW FIRM, LLC, Columbia, South Carolina, for Appellant.  Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, A. W. Bethea, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting

Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises from Timothy Poole's conviction on one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, seventeen counts of substantive mail fraud, in violation of 18 U.S.C. § 1341, and two counts of substantive wire fraud, in violation of 18 U.S.C. § 1343. Poole challenges his convictions and his 400-year sentence. For the reasons that follow, we affirm.

I.

A.

1.

In 1981, Poole, then seven years old, and his three siblings were adopted by Richard and Linda Poole. In 1991, the Pooles moved to Lakewood Plantation, a 3,000 acre estate in a rural, isolated area in Williamsburg County, South Carolina. Richard, a successful businessman, established discretionary trusts for Linda and the children in his will. After Linda's death, the children would become the primary income beneficiaries in the discretion of the trustee, and they would be entitled to receive income from the trust.

In 1994, Poole married Jodie Wise. They had a son in 1998. From 1997 to September 2002, Poole was employed by the Florence

3

(S.C.) County Sheriff's Office. During that period, he purchased a .38 Smith and Wesson revolver.

After Richard's death in 2001, Linda prepared a will that established trust funds for Poole and his siblings. She also gave money to Poole to support his family, including $833 monthly. In 2002, Linda gave $200,000 each to Poole and his siblings, whereupon Poole quit his job.[1] Poole spent the $200,000 within a year. Poole asked Linda for more money, and she gave him an additional $70,000, which he spent within three months. At the same time, some of Poole's checks were returned for insufficient funds.

In August 2004, Linda married Henry Hilton, and placed him in charge of Lakewood. Poole disapproved of this decision.[2] In March 2005, Linda amended her will to make Hilton her executor and the primary beneficiary of her estate. The codicil substituted Hilton for the children as the estate beneficiaries upon Linda's death. Also, under the new arrangement, the trust for the children would not be legally formed if Hilton survived Linda. Thus, Poole and his siblings would not be entitled to received Linda's trust assets unless Hilton died before Linda.

---

[1] Poole told Jodie that he left the Sheriff's Department because of internal politics and lack of salary increases.

[2] After Richard's death, Poole had offered to run the plantation, but Linda declined his offer.

4

On March 23, by letter, Linda informed Poole of these changes. At the time, Linda's estate was worth $5 million.

In 2005, Poole began an affair with Mia Evans. As relevant to this appeal, in August, during the affair, Evans bought for Poole a pair of New Balance, Model 471, size 12 shoes. Evans noticed that Poole always kept a revolver in the console of his Cadillac Escalade. In October, Poole fought with Jodie over his affair with Evans, after which Jodie called Linda, disclosed Poole's affair, and said that Poole had spent all their money. On November 17, by letter, Linda chastised Poole for his marital infidelity. On November 19, in another letter, Linda threatened to remove Poole as a trust beneficiary. Linda also told Poole to get a job and care for his family. Meanwhile, Poole's financial problems continued to worsen.[3]

In 2006, Poole's financial problems escalated further. Poole's bank notified him that future missed mortgage and other loan payments could lead to foreclosure proceedings. On June 4, Linda sent Poole two letters. In the first, she advised Poole that beginning in January 2007, she would give him (and his siblings) a yearly sum of $10,000 in lieu of her $833 monthly

---

[3] He continued to spend money while missing his mortgage and other loan payments. In March, he borrowed $75,000 from Linda after falsely telling her that he would use the money to start a business. Poole paid bills and his living expenses with the money instead.

payment. She also advised Poole that she did not want further requests for money for anything other than medical emergencies, and that Poole needed to establish his own reserve. In the second letter, Linda sent Poole a check for his June mortgage payment, and said that she would cover his July and August mortgage payment but no more. On several occasions during July, Linda told friends that Poole had been coming to Lakewood uninvited, even when Linda was out, for no apparent reason. Linda said that she was not personally afraid of Poole, but she was "very, very afraid" for Hilton.

2.

At noon on August 1, 2006, Poole visited friends Rachel and Robert Atkinson at their home, leaving at 5:15 p.m. Rachel noticed that Poole was wearing "tennis shoes." As he was leaving, Poole informed Rachel that he was going to a GNC store and then returning home. From 1:58 p.m. that day until 10:22 a.m. on August 2, Poole's cell phone was turned off, which prevented his cell phone provider from tracking Poole's location during that period. At 5:30 p.m., Poole went to a GNC store--located about 38 miles and a 44-minute drive from Lakewood--and argued with a store clerk. According to Jodie Poole, who was home that day, Poole returned home between 10:00 p.m. and 11:00

6

p.m.[4]  Jodie believed that Poole was working on the night shift at a Honda plant.

On the morning of August 2, a Lakewood employee noticed that the padlock at the front gate was located upside down, outside the gate; normally, Linda and Hilton locked the gate behind them, causing the padlock to be placed inside the gate. That afternoon, Lakewood employees found Linda's body near the house.  Linda died of two gunshot wounds.  Inside the residence, the employees found Hilton's body.  Hilton had been shot four times.[5]  The bullets that killed Linda and Hilton were consistent with bullets fired from either a .38 Smith and Wesson revolver or a .357 Magnum.

State law enforcement agents arrived at Lakewood later that day.  While they noticed small signs of disturbance in the house, the agents did not believe that a robbery had occurred; there were no signs of a forced entry, and items of significant value were accounted for.  The agents saw shoe prints in the carpet near Hilton's body.  An expert shoe examiner later

---

[4] A video camera located at a gas station captured a car coming from the direction of Lakewood, then making a turn onto a road leading to his house, at approximately 10:53 p.m. on August 1.  An expert witness "could not definitively state that the car in the video was [Poole's] but he could not rule it out either." Brief for United States at 9.

[5] The details of the crime only became public knowledge after September 8, 2006, the date on which the deputy coroner received the final autopsy report.

concluded that the prints shared "limited design features" with a New Balance 471 shoe, but he could not determine the shoe prints' size.

That afternoon, an officer picked up Poole at home and drove him to Lakewood. Enroute, Poole said that he had given a .38 revolver to Linda for her protection after his father's death.[6] That evening, agents interviewed Poole and Jodie separately. Before Jodie's interview, Poole instructed her to falsely tell the agents that he returned home at 6:00 p.m. on August 1, and spent the night with her there. Jodie did so. During his interview, Poole said that he was at the Atkinsons' house during the afternoon of August 1, and he returned home at 6:00 p.m. He then left his house to purchase an item at a GNC store, and returned home at 6:30 p.m. Poole denied having financial problems, then stated that he could always get money from Linda if he did. Poole's interview ended at 9:35 p.m. During the next ten minutes, Poole made several calls to Jodie; he also sent her several text messages, asking her to stop talking to investigators.

On August 3, agents executed a search warrant at Poole's house and vehicle. They seized several firearms, and other

---

[6] The police recovered several firearms from Lakewood, but a .38 pistol was not among them.

8

items, but they did not find Poole's .38 Smith and Wesson revolver or his New Balance shoes.

### 3.

On August 18, 2006, Poole contacted Linda's trust administrator and requested money from her estate to pay his bills. Poole made several additional requests between 2006 and 2008. Jodie also participated in the effort to obtain funds from Linda's estate. From 2006 to 2008, the trust issued multiple checks to Poole, his bank, and his creditors. Poole used these funds, inter alia, to make his mortgage and car payments, and pay his current food, gas, and other bills.

### B.

On April 30, 2009, a grand jury charged that Timothy Poole and Jodie Poole conspired together to commit mail and wire fraud upon Linda's estate. The indictment alleged, in relevant part, that it was part of the conspiracy that Poole and Jodie would conceal Poole's involvement in the Hilton murders so that Poole would remain eligible to inherit monies from Linda's estate.[7]

During a ten-day jury trial in the United States District Court for the District of South Carolina, the government presented testimony from several witnesses. Jodie testified

---

[7] The "Slayer's Rule," codified in South Carolina at S.C. Code Anno. § 62-2-803, prevents a person who "feloniously and intentionally" kills another from benefitting from the death.

9

about Poole asking her to lie as to his whereabouts on the day of the murder.[8]  Additionally, as relevant to this appeal, Mia Evans (with whom Poole had an affair, as noted above),[9] Ryana Cafasso (with whom Poole also had an affair),[10] Rachel Atkinson (the wife of a friend, with whom Poole also had an affair),[11]

---

[8] Jodie, who testified under a limited grant of immunity, also testified about conversations she had with Poole before the murders regarding his desire to move to Lakewood after his father's death, and the reasons he left the sheriff's department.  She testified that Poole did not discuss with her the cost of several items that he purchased.  Jodie was asked about a specific fight she had with Poole, and about the conversation between them when she confronted him regarding his affair with Mia Evans.  Jodie further testified that Poole advised her that on July 31, 2006, he was going to see his mother.  Finally, she testified regarding communications between her and Poole after the murders.

[9] Evans testified that in 2005, as we have noted earlier, she bought a pair of New Balance, Model 471, size 12 shoes for Poole, and that during the same time period she noticed that Poole always kept a revolver in the console of his Cadillac Escalade.  In November 2006, Evans testified, Poole stated to her that he was at home during the murders; that he had thrown out his New Balance shoes after he spilled gas on them while filling his lawn mower; and the police had seized all his guns, including the revolver in his car.  Evans also testified that in February 2007, Poole and Evans vacationed in Tennessee.  During the trip, Evans testified, Poole told her that he had thrown away his New Balance shoes not only because he spilled gas on them, but because they had been chewed up by his dogs.

[10] Cafasso testified that during their relationship, Poole mentioned that Jodie had moved out of their home temporarily.  Poole also told her, Cafasso stated, that he had dinner with Linda and Hilton on July 31.  Whenever they went out, Cafasso observed, Poole wore either boots or Nike shoes.

[11] Atkinson testified that during the last week of November 2006, Jodie asked her whether Poole had left his New Balance shoes at her house.  Atkinson said he had not.  Atkinson testified that Jodie then told her that the Pooles's dogs had eaten the shoes.  Later, Atkinson testified, Jodie repeatedly

10

Julia White (a friend of Cafasso's),[12] and Poole's brother Richard,[13] also provided testimony for the government that suggested that Poole and Jodie had conspired to conceal his involvement in the murders.  The government also introduced evidence of Poole's extramarital affairs, lavish spending and straitened financial circumstances.  Poole was convicted on all counts.  At sentencing, the district court determined by a preponderance of the evidence that Poole killed Linda and Hilton with malice aforethought, and therefore applied a first-degree murder cross-reference, ultimately sentencing him to 400 years of imprisonment.  This appeal followed.

## II.

Poole challenges the district court's denial of his motion for acquittal, claiming there was insufficient evidence to

---

told her that she believed Poole was wearing flip-flops on August 1, the day of the murders.  Atkinson also testified that she falsely told a law enforcement agent in November 2006 that Poole wore flip-flops on August 1.  Atkinson testified that she lied to the police because she was afraid Poole would tell her husband that they had once slept together.

[12] White testified that on September 2, 2006, Poole told her that his parents had been killed "execution style," that Linda was shot twice in the front yard, and that Hilton was shot three or four time and found in the house.

[13] Richard Poole testified that in December 2006, Poole told him that he was in Myrtle Beach on August 1, refused to talk about his gun, and said he didn't understand why agents did not take the shoes because they were at the front door of his house.

support the jury's verdict. Poole also contends that the district court erroneously admitted evidence of other acts, and confidential marital communications. Finally, he raises a host of challenges to his sentence, asserting that the district court erred in enhancing it to life imprisonment by applying a first-degree murder cross-reference, and that the 400-year term of imprisonment is procedurally as well as substantively unreasonable. We consider each challenge in turn.

A.

Poole first argues that there was insufficient evidence to support both his convictions for substantive mail and wire fraud and for conspiracy to commit mail and wire fraud. This court reviews challenges to the sufficiency of evidence supporting a jury verdict de novo. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). The verdict must be upheld if, drawing all reasonable inferences in favor of the prosecution, this court determines that there "is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). In particular, "determinations of credibility are within the sole province of the jury and are not susceptible to judicial review." Id. at 863 (internal quotations omitted). Further, this court must examine the evidence in a "cumulative

12

context"--as opposed to "in a piecemeal fashion"--to determine its sufficiency.  Id.

1.

We first address the convictions on the substantive counts. The elements of mail or wire fraud are (1) the existence of a scheme to defraud, and (2) use of the mails or wires to perpetrate the scheme.  United States v. Vinyard, 266 F.3d 320, 326 (4th Cir. 2001).[14]  To establish the first element, the government had to prove that Poole "acted with the specific intent to defraud, which may be inferred from the totality of the circumstances and need not be proven by direct evidence." United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001)(internal quotations omitted).  A scheme to defraud includes "an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive."  United States v. Pasquantino, 336 F.3d 321, 333 (4th Cir. 2003) (en banc).

The parties agree that in order to prove that Poole committed mail and wire fraud, the government was required to establish, beyond a reasonable doubt, that Poole "feloniously and intentionally" killed Linda and Hilton.  The parties

_____

[14] We address only the first element, as there is no dispute that Poole made use of the mails and wires to obtain funds from Linda's estate.

13

disagree, however, as to whether the government met that burden at trial. In denying Poole's motion for a judgment of acquittal, the district court held that there was sufficient evidence to sustain a conviction as to each count. We agree.

The government presented evidence that before the murder, Poole made repeated trips to Lakewood at odd times (from which the jury could reasonably have inferred that he was attempting to determine the best time to kill Linda and Hilton), turned his cell phone off (from which the jury could reasonably have inferred that he was attempting to conceal his whereabouts), and by arguing with a store clerk shortly before the murders occurred (from which the jury could reasonably have inferred that he tried to create a partial alibi). While Poole offers alternative explanations in each instance, we need only find that the jury could have reasonably credited the government's theory. Similarly, while no witness testified that Poole wore a specific model of New Balance shoes on the day of the murder, and the print could have been made by a number of other models, the jury could reasonably have concluded from the circumstantial evidence that the disappearance of Poole's shoes, and his conflicting and inconsistent statements about them, evinced his guilt. Testimonial evidence was also inconclusive as to the .38 caliber firearm, but the jury reasonably could have concluded that Poole's post-murder conduct indicated that he had concealed

14

the gun's whereabouts after the murder.[15]  Furthermore, the jury could as well reasonably have agreed with the government that the presence of only small signs of a disturbance at Lakewood, coupled with the absence of evidence that anything of value was taken, indicated that the murderer tried to create a staged robbery to conceal his personal motive from investigators. Finally, Poole's inconsistent statements regarding his whereabouts on the day of the murder, his false statement that his mother was still supporting him financially at the time of the murder, and his statement indicating that he knew that Linda and Hilton were killed "execution style,"[16] none of which Poole contests, all support his conviction.[17]

---

[15] Notably, Poole told the police that he had given the revolver to his mother, but later told Mia Evans that the police seized all of his guns after the murders.  Poole also refused to talk about his gun with his brother Richard in November and December 2006.

[16] Notably, Julia White testified that Poole informed her of the details of the murders on September 2, 2006.  That date preceded the release of the final autopsy report on September 8, 2006, the earliest date on which such details could have become public knowledge.

[17] We are also unpersuaded by Poole's reliance on Evans-Smith v. Taylor, 19 F.3d 899 (4th Cir. 1994).  There was virtually no evidence, nor any motive, linking the defendant to the murder in Evans-Smith.  Here, by contrast, the government has presented a strong motive, and substantial circumstantial evidence pointing to Poole.

2.

Next, we address the conviction on the conspiracy count. The elements of a mail and wire fraud conspiracy are: (1) the existence of an agreement to commit mail or wire fraud, (2) willing participation by the defendant, and (3) an overt act by one of the defendants in furtherance of the agreement. United States v. Edwards, 188 F.3d 230, 234 (4th Cir. 1999). Proof of a conspiracy may be shown by circumstantial evidence, including evidence of the existence of a "tacit or mutual understanding" between the defendant and his accomplice. United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997). "It is not necessary that each member of a conspiracy have knowledge of all the details of the conspiracy, but it is only necessary that a conspirator have knowledge of the essential object of the conspiracy." United States v. Goldman, 750 F.2d 1221, 1227 (4th Cir. 1984).

Accordingly, in order to prove that Jodie and Poole conspired to commit mail and wire fraud, the government is required to show both that Jodie and Poole conspired to conceal his involvement in the murder of Linda and Hilton, and also that an essential object of that conspiracy was to ensure that Poole remained eligible to recover from Linda's estate.

a.

As to whether Jodie and Poole conspired to cover up the fact that he killed Linda and Hilton, Poole contends that the evidence clearly establishes that Jodie had no knowledge that he killed Linda and Hilton, and therefore could not have willingly participated in the conspiracy. The government argues that her knowledge was established inferentially by her conduct of obstructing the criminal investigation of her husband. As noted above, the district court held that the evidence was sufficient as to each count. Although the evidence underlying the conspiracy counts is not overwhelming, we conclude that it was sufficient, given the inferences to be drawn in the government's favor.

Jodie provided a false alibi for Poole to the investigators; falsely advised a witness that he wore flip-flops on the day of the murder; and made misleading statements regarding the disappearance of his shoes. A jury could infer from these actions coordination between Jodie and Poole, and that Jodie knew that Poole had murdered Linda and Hilton. To be sure, the jury could reasonably have instead concluded based upon this evidence that these were the actions of a concerned wife trying to exonerate her accused husband. Crucially, however, it drew the opposite, also reasonable inference that

17

the evidence supported a conspiracy to conceal her husband's involvement in the Hilton murders.

b.

As to whether an essential object of the conspiracy was to commit mail and wire fraud, the district court found, and counsel for Poole acknowledged during oral argument, that Jodie participated in efforts to obtain funds from Linda's estate. Given the deferential standard of review we accord to jury findings, this evidence was sufficient to allow the inference that Jodie knew that an essential object of the conspiracy was to defraud Linda's estate.

B.

The second issue presented on appeal is whether the district court (1) abused its discretion by admitting evidence of Poole's other acts, including his marital infidelity, lavish lifestyle and straitened financial circumstance, and (2) committed plain error by admitting his confidential marital communications to Jodie. We consider each evidentiary ruling in turn.

1.

We first address whether the district court abused its discretion by admitting evidence of Poole's other acts. Evidence of other acts is admissible under Federal Rules of Evidence 403 and 404(b) if four conditions are satisfied.

18

First, the evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . Second, the act[s] must be necessary in the sense that [they are] probative of an essential claim or an element of the offense. Third, the evidence must be reliable. Finally, the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

United States v. Gray, 405 F.3d 227, 239 (4th Cir. 2005). (internal alterations and quotations omitted). An error in admitting other-acts evidence is evaluated for harmlessness. An error is harmless if there is a "fair assurance" that the jury's judgment was not substantially swayed by the error. United States v. Cole, 631 F.3d 146, 155 (4th Cir. 2011).

All four conditions are satisfied with respect to the evidence of Poole's marital infidelity, lavish lifestyle and straitened financial circumstance. The evidence of adultery went to motive and Poole's need to finance an extravagant lifestyle. See Gray, 405 F.3d at 239-40. It was also necessary context for Evans's testimony about the gun, Cafasso's testimony about the shoes, and to explain why Atkinson initially lied about Poole's wearing flip flops the day of the murders. The marital infidelity evidence was not unduly prejudicial. Two of the witnesses only briefly described their sexual escapades with Poole, and the district court issued an instruction not to use that evidence improperly. Likewise, evidence of Poole's lavish

19

lifestyle and straitened financial circumstance went directly to motive.[18] See United States v. Kuzlik, 468 F.3d 972, 974-75 (7th Cir. 2006) (admitting evidence of financial problems to show motive).

2.

Next, we address whether the district court committed plain error by allowing into evidence Jodie's testimony regarding marital confidences. We have held that marital communications are "presumptively confidential," United States v. Parker, 834 F.2d 408, 411 (4th Cir. 1987), and that the "privilege reaches those marital communications made in confidence and intended to be confidential." United States v. Broome, 732 F.2d 363, 364 (4th Cir. 1984). This circuit has held, however, that where marital communications involve the commission of a crime in which both spouses are participants, they do not fall within the marital privilege. Parker, 834 F.2d at 411.

Poole contends that Jodie's testimony is squarely within the marital communications privilege. The government argues that Poole's statements to Jodie after the murders fall within the so-called joint crime exception to the marital

---

[18] Although the testimony of Poole's friends about his "materialism" seems cumulative and less indicative of motive, we conclude that such an error, if any, in its admission was harmless.

20

communications privilege, and that most of Poole's statements and conduct preceding the murder were not privileged. We agree.

Jodie's most damning testimony, that Poole asked her to lie about his whereabouts, is taken out of the marital communications privilege because she participated in the mail and wire fraud. The district court also did not plainly err in admitting Jodie's testimony regarding statements and conduct preceding the murder. At least some of the statements were not privileged because Poole had made similar statements to others and were therefore not intended to be confidential.[19] Testimony regarding Poole's failure to tell Jodie about the costs of certain items did not go to any marital communication. Finally, though Poole's statements regarding his reasons for leaving the Sheriff's Department, and his lie that he was working nights at Honda, were privileged, there was no plain error because they added nothing material to the government's case.

C.

The third issue presented on appeal is whether the district court abused its discretion in enhancing Poole's sentence to life imprisonment by applying a first-degree murder cross-

---

[19] Poole disclosed to Cafasso the arguments with Jodie that caused her to move out of their home temporarily. Poole also mentioned to investigators and to Cafasso that he was going to visit Linda on July 31, 2006.

21

reference, pursuant to sections 2B1.1(c)(3) and 2A.1(a)of the Sentencing Guidelines.  We hold that it did not.

Section 2B1.1(c)(3) provides, in relevant part, that if the defendant was convicted under 18 U.S.C. § 1341, and the "conduct set forth in the count of conviction establishes an offense specifically covered by another guideline . . . apply that other guideline."  As discussed above, Poole's convictions for mail and wire fraud required the government to prove beyond a reasonable doubt that he "feloniously and intentionally killed" Linda and Hilton.  At sentencing, the district court found that Poole killed Linda and Hilton deliberately and with premeditation, and thereby committed first-degree murder, an offense specifically covered by section 2A1.A.

Any kind of willful, deliberate, malicious and premeditated killing is murder in the first degree.  United States v. Wright, 594 F.3d 259, 267 (4th Cir. 2010) (quoting 18 U.S.C. § 1111). Malice is established by conduct that is reckless, wanton, and a gross deviation from a reasonable standard of care that warrants a conclusion that the defendant was aware of a serious risk of death or serious bodily harm.  United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003).  Premeditation requires a prior design to commit murder and a period of reflection for at least a short time before the killing.  United States v. Sinclair, 301 Fed. Appx. 251, 254-55 (4th Cir. 2008).  Under the Sentencing

22

Guidelines, the sentencing court determines whether the defendant committed first degree murder by a preponderance of the evidence. Wright, 594 F.3d at 267-68.

Here, many facts support the conclusion that Poole behaved willfully, deliberately, maliciously, and with premeditation. Poole's behavior before the murders (making visits to Lakewood, giving rise to the inference that he was attempting to determine the best time to kill his victims) and on the day of the murders (turning off his cell phone, giving rise to the inference that he was trying to avoid detection, and arguing with a store clerk, giving rise to the inference that he was trying to create a partial alibi), the fact that he had sufficient time to reflect on his actions as he was driving to the plantation, and that the killings were committed "execution style," amply justify the conclusion that he committed murder in the first degree. Indeed, we have previously upheld first-degree cross-references under similar circumstances. See United States v. Gray, 253 Fed. Appx. 321 (4th Cir. 2007).[20]

---

[20] Notably, in Gray, the court relied on the fact that the indictment "clearly depicts conduct of premeditation and deliberation by the defendant," 253 Fed. Appx. at 323, and Poole concedes that the language of the indictment in Gray and the instant case mirror each other.

23

D.

The fourth issue presented on appeal is whether the district court erred, procedurally or substantively, in sentencing Poole to a 400-year term of imprisonment. We review a sentence for reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). We hold that the sentence imposed was both procedurally and substantively reasonable.

1.

Poole argues that the district court improperly applied section 5G1.2(d) of the Sentencing Guidelines, which allows the court to impose sentences consecutively if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, "but only to the extent necessary to produce a combined sentence equal to the total punishment." Where, as here, the "total punishment" is life imprisonment, the Guidelines do not specify whether a district court may impose consecutive sentences exceeding the defendant's life expectancy. Poole argues that the phrase "only to the extent necessary" should be interpreted to limit the imposition of consecutive sentences to the defendant's life expectancy, as measured by state law. The government points to precedent from other circuits recognizing the district court's discretion to impose a sentence functionally equivalent to life imprisonment by

24

imposing consecutive sentences, even where they exceed the defendant's natural life span. See United States v. Lewis, 594 F.3d 1270, 1275-76 (10th Cir. 2010) (310 years); United States v. Thompson, 523 F.3d 805, 812-14 (7th Cir. 2008) (190 years).

We agree with our sister circuits in this regard. This view appears consistent with our decisions, where we noted that the then-mandatory Sentencing Guidelines would obligate a district court to impose consecutive sentences exceeding the defendant's life span to reach the total punishment of life imprisonment. See, e.g., United States v. Hall, 39 Fed Appx. 32, 34 (4th Cir. 2002); United States v. Gibbs, 22 Fed. Appx. 96, 98 (4th Cir. 2001).[21]

## 2.

Finally, Poole argues that because his life expectancy is but a fraction of his sentence, the term of imprisonment is substantively unreasonable. Again, we disagree. Section 2A1.1, comment (n.2(a))of the Sentencing Guidelines expressly provides that life imprisonment is the appropriate sentence for a premeditated killing. See Wright, 594 F.3d at 267-269 (upholding life term based on cross-reference to section 2A1.1). As has been noted, a sentence of such length is, for "practical

---

[21] We have expressly held that "stacking" sentences under section 5G1.2(d) remains reasonable post-Booker. United States v. Allen, 491 F.3d 178, 195 (4th Cir. 2007).

purposes . . . a life sentence, and that's how we view it." United States v. Betcher, 534 F.3d 820, 827-28 (8th Cir. 2008); see also United States v. Hanna, 353 Fed Appx. 806, 807 (4th Cir. 2009)(440-year sentence); United States v. Schellenberger, 246 Fed. Appx. 830, 833 (4th Cir. 2007) (100-year sentence).

## III.

For the foregoing reasons we affirm the judgment of the district court.

AFFIRMED