**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-1735**

_____

LEOPOLD MUNYAKAZI,

                    Petitioner,

          v.

LORETTA E. LYNCH, Attorney General,

                    Respondent.

_____

On Petition for Review of an Order of the Board of Immigration
Appeals.

_____

Argued: March 24, 2016                    Decided: July 11, 2016

_____

Before TRAXLER, SHEDD, and FLOYD, Circuit Judges.

_____

Petition denied by published opinion. Judge Shedd wrote the
opinion, in which Judge Traxler and Judge Floyd concurred.

_____

**ARGUED:** Ofelia Lee Calderon, CALDERON SEGUIN PLC, Fairfax,
Virginia, for Petitioner. Jeffrey Lawrence Menkin, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.
**ON BRIEF:** Benjamin C. Mizer, Principal Deputy Assistant Attorney
General, Civil Division, Mark C. Walters, Senior Counsel for
National Security, National Security Unit, Office of Immigration
Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent.

_____

SHEDD, Circuit Judge:

Leopold Munyakazi petitions for review of the Board of Immigration Appeals' (BIA) denial of his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Because substantial evidence supports the agency's rulings, we deny the petition.

## I.

As a matter of background, we begin by quoting a United States State Department summary of the 1994 Rwandan genocide:

> Longstanding tensions in the country culminated in the 1994 state-orchestrated genocide, in which Rwandans killed between 750,000 and one million of their fellow citizens, including approximately three-quarters of the Tutsi population. Following the killing of the president in 1994, an extremist interim government directed the Hutu-dominated national army, militia groups, and ordinary citizens to kill resident Tutsis and moderate Hutus. The genocide ended later the same year when the predominantly Tutsi RPF . . . defeated the national army and Hutu militias and established an RPF-led government of national unity.

(J.A. 527).

Munyakazi, an ethnic Hutu, is a native and citizen of Rwanda who came to the United States in 2004 on a business visa. Prior to his visa's expiration, Munyakazi filed an application for asylum and withholding of removal. While in the United States, Munyakazi, who worked as a college professor in Rwanda, began teaching at Montclair State University in New Jersey. In October 2006, he spoke at a faculty forum at the University of

2

Delaware. During this speech, Munyakazi expressed his opinion that the 1994 massacre of ethnic Tutsis in Rwanda was fratricide, not genocide. He would express similar views in another speech later that year.

In November 2006, Rwanda issued an international arrest warrant for Munyakazi, charging him with genocide and genocide negation. Rwanda issued a second warrant for the same charges in October 2008. In January 2009, almost five years after Munyakazi filed his initial asylum application, the Department of Homeland Security (DHS) issued him a notice to appear, charging him with removability. Munyakazi conceded removability but filed revised applications for asylum and withholding of removal. Munyakazi also requested CAT protection. An Immigration Judge (IJ) held a multi-day hearing on Munyakazi's removability.

Munyakazi testified at the hearing that at the time the genocide began he and his family lived in the Rwandan capital, Kigali. Although a travel ban was in place, Munyakazi and his family joined a convoy[1] to his native village of Kirwa. On the morning of April 19, 1994, Munyakazi briefly went to a local government office in Kirwa to report an attempted break-in at his home in Kirwa. He then returned to that home and did not

---

[1] The convoy was headed by a high-ranking Hutu general who has since been indicted for participation in the genocide.

leave until after April 22. Munyakazi testified that sometime after April 22 he helped five Tutsi women obtain Hutu ID cards.

Munyakazi's testimony that he remained indoors for several days is important because following a rally at a soccer stadium on April 19, ethnic Hutus killed virtually every Tutsi in Kirwa.[2] While acknowledging this fact, Munyakazi testified that he saw little to no violence and did not know anyone responsible for any of the violence. When pressed with accounts from genocidaires—persons convicted of genocide in the Rwandan courts—that he was involved in the violence in Kirwa, Munyakazi testified that the Rwandan government was forcing them to speak out against him.

Munyakazi further testified that he was arrested later in 1994 and held without charge until 1999. During his time in captivity, he was subjected to beatings and psychological stress.

Munyakazi's wife, Catherine Mukantabana, also testified before the IJ. Catherine, an ethnic Tutsi, generally agreed with Munyakazi's testimony regarding their exit from Kigali and

---

[2] The Immigration and Customs Enforcement (ICE) Agent who conducted an investigation into Rwanda's allegations against Munyakazi testified that investigators could find only one unattached (i.e., not married to a Hutu) Tutsi in the entire village—a man who was a child at the time of the genocide and hid in the woods.

4

travel to Kirwa. Discussing their time in Kirwa, she testified that she did not believe there was a meeting on April 19 but conceded that her husband left the house that morning to go to the government offices and to run some errands. She testified that Munyakazi helped five Tutsis receive Hutu ID cards and that he did not participate in the genocide. Importantly, she testified that the five Tutsis arrived at their house prior to April 19 and that Munyakazi took their names to Kirwa's mayor on April 19. She also testified that many members of her family were killed during the genocide, and the IJ noted that she was "tense and stressed" discussing the genocide and that "[h]er hands were shaking." (J.A. 896).

In addition to this testimony, Munyakazi also presented several other witnesses, including former Attorney General Ramsey Clark, who testified generally about the Rwandan justice system and the genocide. None had first-hand knowledge of Munyakazi's actions during April 1994. Munyakazi also placed into evidence five letters from the Tutsis he claimed to have aided in obtaining Hutu ID cards. One letter writer stated that Munyakazi assisted her in obtaining an ID card on April 19, while another stated that Munyakazi aided her on April 20.

In response to Munyakazi's evidence, the Government put forth testimony and investigation reports from ICE Special Agent Jason Hyman. Hyman, along with two DHS agents, traveled to

5

Rwanda in June 2009 to conduct an independent investigation into the Rwandan government's accusations against Munyakazi. The DHS investigators created an interview list after reviewing Rwandan government files. The Rwandan prosecutors gave DHS latitude in conducting the investigation, and the Rwandans' main role was locating interpreters and procuring the witnesses. Hyman testified that they tried to give the Rwandan government little notice of the interviewees to minimize the chances that the government would pressure them. The investigators would also ask each witness if they had spoken to Rwandan authorities and whether their statements were coerced. Importantly, the DHS investigators uncovered several witnesses, including a genocidaire, who had never spoken to Rwandan officials about Munyakazi.

The DHS investigation confirmed the broad outline of Munyakazi's testimony—that he and his family fled Kigali in April, traveled to Kirwa, and remained there during the genocide. The investigation found that the genocide in Kirwa began following a meeting at a soccer field on April 19. In contrast to Munyakazi's testimony, however, the investigation revealed that Munyakazi, wearing banana leaves,[3] addressed the

---

[3] The rally leaders told the attendees to wear banana leaves in order to identify themselves as Hutu.

crowd at the soccer field on April 19 and helped to instigate the genocide. After the meeting, Munyakazi led a group of Hutus to find Felicien, an educated Tutsi who was eventually killed. Munyakazi also had a role in orchestrating night raids against Tutsi homes.

In total, the investigators interviewed 22 witnesses, six of whom were convicted of genocide. Each interview was between two-and-a-half and three hours in length. Generally, the witnesses were afraid of Munyakazi and feared retribution from him if he found out they cooperated with authorities. Several witnesses testified that members of Munyakazi's family contacted them and offered them money if they refused to implicate Munyakazi.[4] Importantly, "[t]he ICE investigation revealed no individuals who attended the large meeting [at the soccer field] and who did not see Dr. Munyakazi there." (J.A. 911).

Hyman was recalled to the stand to address the interview reports individually. Relevant here, Hyman discussed an interview with TM, a convicted genocidaire. TM was not identified by the Rwandans and had never been previously interviewed by Rwandan authorities. The investigators uncovered

---

[4] The investigators tracked down a nephew who was allegedly responsible for the attempted bribes. The nephew denied offering bribes to witnesses but did admit that Munyakazi participated in the soccer field meeting wearing banana leaves. The nephew also admitted to his own participation in the genocide.

his name during another interview and tracked him down the next day. TM told the investigators that he was at the soccer meeting and that Munyakazi was there wearing banana leaves. Munyakazi told other Hutus to wear the leaves to avoid being mistaken as a Tutsi. TM was able to draw a diagram of the soccer field and the relative position of the leaders, including Munyakazi. TM told the investigators that after the meeting Munyakazi led a group to Felicien's house. During this trip, Munyakazi met with a smaller group of Hutus and urged them to kill Tutsis because they were enemies of true Rwandans.

After the hearing, the IJ issued a 63-page opinion denying Munyakazi's applications for asylum, withholding of removal, and protection under CAT. The IJ began by finding that Munyakazi was not credible. The IJ noted that Munyakazi specifically testified that he did not leave his house from April 19-22 but that letters from two of the Tutsis he claimed to help, as well as the testimony of his wife, suggested otherwise. "[T]hese discrepancies," the IJ found, "go to the heart of where the Respondent was and what he was doing on and after April 19, 1994." (J.A. 923). In addition, the IJ explained that Munyakazi's testimony about the genocide "is quite vague and appears at odds with what would be expected given the size of the village, given the significance of the events, and given his wife's recollections." (J.A. 924). The IJ also discussed

8

Catherine's testimony, concluding that she "has an interest" in the outcome of the asylum petition, and, "[g]iven the extent of the genocide in Kigali and Kirwa, [she] likely owes her life and those of her children to her marriage to" Munyakazi. (J.A. 925).

Addressing the DHS investigation, the IJ found that, out of an abundance of caution, she would not credit the testimony of the convicted genocidaires. The IJ made an exception for TM, the individual uncovered by the investigators. The IJ also found that the testimony of the genocide survivors who identified Munyakazi as a participant was credible. The IJ noted that in contrast to genocidaires who have an incentive to point the finger at others in exchange for leniency, genocide survivors face violence and intimidation for testifying against genocide participants. (J.A. 928). The IJ referred to several survivors who placed Munyakazi at the soccer field or who heard that Munyakazi was looking for them. The IJ summarized her views on the investigation as follows:

> There is certainly the possibility of the Rwandan government attempting to pressure victims and other witnesses. This does not explain the variations in accounts from the witnesses or the fact that these variations remain consistent with each other. It also does not justify the risk being taken by victims and other witnesses, since there is no indication that the Rwandan Government can protect adequately those individuals. In addition, the ICE special agents sought to identify witnesses independently and to give minimal notice to the Rwandan government when they needed assistance in locating witnesses. This limited the time available for Rwandan government officials to

9

influence or coach witnesses. Finally, while record evidence establishes that those accused of genocide are pressured to implicate others in exchange for leniency, evidence in the record regarding any improper influence of other witnesses by the Rwandan government is vague and far less specific.

(J.A. 929-30).

Given these factual findings, the IJ then addressed whether Munyakazi was eligible for asylum. First, the IJ concluded that Munyakazi, even with the adverse credibility finding, qualified for asylum because he has a well-founded fear of future persecution based on a protected ground—his political opinion. Nonetheless, the IJ found Munyakazi was statutorily ineligible for asylum under the persecutor bar because he "ordered, incited, assisted, or otherwise participated in the persecution of others on account of their Tutsi ethnicity." (J.A. 932). The IJ found that the DHS investigation supported a finding that Munyakazi participated in the genocide and that Munyakazi failed to prove otherwise by preponderance of the evidence. This finding also rendered Munyakazi ineligible for withholding of removal. Finally, the IJ found Munyakazi was not entitled to relief under CAT.

Munyakazi appealed to the BIA. A three-member panel of the BIA dismissed the asylum and withholding of removal appeals, upholding the IJ's credibility determinations and her conclusion

10

that the persecutor bar applied.[5] The BIA remanded the CAT claim for further factual findings.

Thereafter, the IJ held another evidentiary hearing on Munyakazi's CAT claim. Following the hearing, the IJ issued a written order denying relief. The IJ found that Munyakazi claimed to be "mistreated" during his earlier detention but that "significant developments" in Rwanda gave his allegations of mistreatment "little relevance" to his current situation. (J.A. 101). The IJ did find that Munyakazi was likely to be arrested and detained if he was returned to Rwanda and that, because he was facing charges relating to genocide, he would be detained in a civilian detention facility rather that a military facility. This distinction was crucial to the IJ because, although the civilian facilities have "poor conditions," those conditions—overcrowding, visit limitations, inconsistent food and medicine and sporadic beatings—did not meet the legal definition of torture. (J.A. 102). The IJ relied on a 2012 State Department Report as well as reports from Amnesty International and monitoring reports from the International Criminal Tribunal for

---

[5] The BIA did not address whether Munyakazi qualified for asylum notwithstanding the persecutor bar.

Rwanda (ICTR), to support the finding that accused genocidaires were held in civilian detention facilities.[6]

In reaching the conclusion that Munyakazi more likely than not would be detained in a civilian prison, the IJ noted that his own witness, Simeon Babonampoze, testified that he did not see any persons charged with genocide at the military facility where he was detained. The IJ also explained that while Munyakazi claimed that his arrest warrant was politically motivated, there was no evidence that Rwanda was charging him with terrorist or political offenses, and that Munyakazi was not a member of the opposition party, the United Democratic Forces (UDF).

Munyakazi again appealed to the BIA, and the BIA dismissed. The BIA concluded that the IJ's factual findings were not clearly erroneous and that, with those factual findings—including the finding that Munyakazi would be detained in a civilian prison—he could not show it was more likely than not that he would be tortured. The BIA agreed with the IJ that even though conditions in civilian prisons were "far from ideal," Munyakazi "has not established that the conditions amount to torture." (J.A. 4).

---

[6] In contrast, the IJ determined that conditions in military detention facilities were much more severe and might rise to the level of torture in some cases.

12

Munyakazi filed a timely petition for review of both of the BIA's orders. Munyakazi also filed a motion for stay of deportation, which we denied.

## II.

## A.

Munyakazi first petitions for review of the denial of his applications for asylum and withholding of removal. Our standard of review in this area is familiar. To begin, because the BIA adopted the IJ's decision and provided additional reasons, we review both decisions.[7] Hernandez-Avalos v. Lynch, 784 F.3d 944, 948 (4th Cir. 2015). We must uphold the decision to deny relief unless it is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). We review the agency's findings of fact for substantial evidence, a "narrow and deferential" review, Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011), under which the agency's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). See also Djadjou, 662 F.3d at 273 ("Substantial evidence exists to support a finding unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to

---

[7] For ease of reference, we refer to the BIA and IJ collectively as "the agency."

13

the contrary") (internal quotation marks omitted). We review any legal issues de novo. Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010).

The agency's adverse credibility finding is also subject to the substantial evidence standard. We uphold an adverse credibility determination if the agency provides specific, cogent reasons that go to the heart of Munyakazi's claim for relief.[8] Djadjou, 662 F.3d at 274. "[O]missions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination." Id. at 273.

B.

The agency found that Munyakazi was statutorily barred from receiving asylum or withholding of removal under what is commonly called the "persecutor bar." By statute, an asylum applicant must prove that he is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee is defined, inter alia, to exclude any person who "ordered, incited, assisted, or otherwise

---

[8] This "heart of the claim" standard was modified by the REAL ID Act of 2005, which permits an IJ to base a credibility determination "without regard to whether [an inconsistency] goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). Because Munyakazi's application for asylum was filed prior to the REAL ID Act's implementation, that standard is inapplicable here. Tassi v. Holder, 660 F.3d 710, 716 n.6 (4th Cir. 2011)

14

participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A) (asylum); 1231(b)(3)(B)(i) (withholding of removal). If there is evidence showing that Munyakazi participated in the persecution of a particular social group (here, the Tutsis), then "he must prove by a preponderance of the evidence that he is not barred from relief on this ground." Higuit v. Gonzales, 433 F.3d 417, 420 (4th Cir. 2006). The "evidence" necessary to trigger the bar is not high—it must only "raise the inference" of participation in persecution. Alvarado v. Gonzales, 449 F.3d 915, 930 (9th Cir. 2006). In addition, "while the commission of actual physical harm may be sufficient to bring an alien within the persecution exception, it is not necessary." Higuit, 433 F.3d at 421. Accordingly, if there is evidence that Munyakazi was present and participating during the April 19 meeting at the soccer field in Kirwa, the persecutor bar would apply regardless of whether he personally committed acts of violence against Tutsis.

In his petition, Munyakazi argues there is no "evidence" that he assisted or participated in the genocide and that he proved by a preponderance of the evidence that he was not barred from relief. We address each argument in turn.

15

C.

In finding that Munyakazi was a persecutor, the agency relied on the DHS interviews with: (1) TM, the genocidaire that DHS tracked down independently of the Rwandan government; (2) two survivors who said they saw Munyakazi at the soccer field meeting; (3) a survivor who was hiding in her house when Munyakazi came and told the Hutus to spare her because she was married to a Hutu; (4) a survivor who was hiding when men came to her house and told her Munyakazi had ordered them to take her children and grandchildren; and (5) a survivor who hid in the woods during the genocide and was told that Munyakazi had been searching for her father in order to kill him. These interviews clearly constitute sufficient "evidence" that Munyakazi assisted or participated in the genocide.

Munyakazi launches a broad assault against the DHS investigation and Special Agent Hyman, asserting that the interviews were flawed because the Rwandan government pressures witnesses to implicate people in the genocide and the DHS investigators relied on documents supplied by the Rwandan government during the investigation.[9] But, the agency considered

---

[9] Munyakazi also asserts that his release in 1999 proves he was not implicated in the genocide. Special Agent Hyman testified that a Rwandan official said that many people were released because the newly formed government lacked the ability to bring cases to trial. As we have seen in other contexts, it
(Continued)

16

this argument and decided not to consider most of the genocidaires' interviews on this basis. The agency was nonetheless permitted to weigh the testimony of Special Agent Hyman that the survivors were being truthful and were fearful of Munyakazi because the "evidence in the record regarding . . . improper influence" of the survivors was "vague and far less specific." (J.A. 930). The agency was likewise permitted to credit the interview with TM because there was no evidence that the government had the opportunity to influence his interview.

DHS sent three investigators to Rwanda for several weeks to investigate the allegations against Munyakazi. While the DHS investigators necessarily relied on Rwandan documents to start their investigation, to the extent practicable they kept the Rwandan prosecutors at arms-length and made interview requests as late as possible to minimize the possibility of undue coercion. It is unclear what Munyakazi believes the agents should have done instead. DHS, instead of simply accepting Rwanda's allegations, performed its own investigation under less-than-ideal circumstances, and nothing in the record compels us to find that the agency should not have credited that

_____

is hardly rare for governments to find perpetrators many years later. See Szehinskyj v. Attorney General, 432 F.3d 253, 254 (3d Cir. 2005) (noting recent spate of denaturalization proceedings against former Nazis based on new evidence).

investigation. Munyakazi's attempt to second guess the DHS investigation and survivor interviews is an effort to have us reweigh the evidence in his favor, but our standard of review "does not permit a re-weighing of the evidence." Lin v. Holder, 736 F.3d 343, 351 (4th Cir. 2013). Accordingly, we hold that substantial evidence supports the agency's conclusion that Munyakazi assisted and participated in the genocide.

D.

Given this conclusion, the burden shifts to Munyakazi to show that he is not subject to the persecutor bar. The agency concluded that Munyakazi failed to satisfy his burden, primarily because his testimony was not credible. In reaching that finding, the agency pointed to the discrepancies regarding: (1) what Munyakazi was doing between April 19 and April 22; and (2) his vague testimony about the genocide in Kirwa.

Munyakazi contends that any confusion about dates in April 1994 did not go to the "heart" of his asylum claim. We disagree. As the BIA cogently explained, these discrepancies were "central to [his] claim because they address where he was and what he was doing during the genocide." (J.A. 770). Munyakazi testified unequivocally that, other than a quick errand on the morning of April 19, he did not leave his house between that day and April 22 and that he did not help obtain Hutu ID cards until after that date. Two of the Tutsis submitted letters stating that he

18

aided them on April 19 and April 20, and his wife testified that he went out for some time the morning of April 19. It is possible that the letters refer to the dates Munyakazi helped the women at his home, not at a government office, but if the administrative "record plausibly could support two results: the one the [agency] chose and the one [Munyakazi] advances, reversal is only appropriate where the court finds that the evidence not only supports [Munyakazi's] conclusion, but compels it." Niang v. Gonzales, 492 F.3d 505, 511 (4th Cir. 2007) (internal quotation marks and alterations omitted). The record supports the agency's conclusion that the letters conflict with his testimony.

Thus, nothing compels the conclusion Munyakazi advances. Munyakazi specifically testified he did not go to the government offices with the Tutsis until after April 23, their letters said otherwise, and his own wife testified that he took the list of Tutsis he was obtaining ID cards for when he left the house on April 19. These inconsistencies "were neither trivial nor unconnected to the core" of Munyakazi's claim. Dankam v. Gonzales, 495 F.3d 113, 122 (4th Cir. 2007). Those dates in April, and Munyakazi's activities on those dates, are central to whether Munyakazi assisted in the genocide.

We upheld an adverse credibility finding under similar circumstances in Dankam. In Dankam, the IJ had focused on the

19

alien's "internal inconsistencies" regarding three alleged arrests and detentions. Id. We explained that, "[b]ecause the arrests are the key events underlying Dankam's claim for asylum, it follows that the details surrounding these arrests and the dates on which they occurred are more than minor or trivial details." Id. (emphasis added). Likewise, the entirety of Munyakazi's claim hinges on what he was doing on April 19 and the days immediately following; discrepancies about his activities on those days necessarily go to the heart of his claim.

Munyakazi's vague testimony about the genocide also supports the adverse credibility determination. He testified that he saw virtually no outward signs of violence toward Tutsis in Kirwa—no bodies, no destruction, no idea who started the alleged violence. Special Agent Hyman testified that Kirwa was a small agrarian village where everyone "seemed to know each other." (J.A. 902). Hyman also testified that there were very few Tutsis left in the village, and only one who was not married to a Hutu. Munyakazi is a college professor, and it strains credulity to believe that he was unaware that every Tutsi in his small village was being butchered even as he sat at home. Munyakazi points to language in the DHS investigation that the genocide was not as severe in Kirwa's province as elsewhere in Rwanda, but that statement must be read against Special Agent

20

Hyman's testimony that there were few Tutsis remaining in Kirwa. We give the agency "ample room" to "exercise common sense" in making a credibility determination "even if the IJ cannot point to" specific record evidence. Tewabe v. Gonzales, 446 F.3d 533, 540 (4th Cir. 2006) (internal quotation marks omitted). Common sense supports the agency's finding that Munyakazi's vague testimony about widespread killings in a small village lacked credibility.

In sum, the inconsistencies regarding Munyakazi's activities on April 19 and the following days, as well as Munyakazi's vague testimony about the genocide in Kirwa "add to and create a cumulative effect that is sufficient to support" an adverse credibility finding. Dankam, 495 F.3d at 123. Substantial evidence thus supports the agency's adverse credibility finding.

Here, upholding the adverse credibility finding requires us to deny the petition for review. With that finding intact, substantial evidence supports the BIA's conclusion that Munyakazi cannot meet his burden. Without his own testimony, Munyakazi is left with the five similarly worded letters from the Tutsis he purportedly assisted and the general testimony from his witnesses regarding conditions in Rwanda and alleged coercion on the part of the Rwandan government. None of this testimony compels a conclusion that Munyakazi showed by a

21

preponderance of the evidence that he did not assist or participate in the genocide.

Accordingly, we conclude that substantial evidence supports the agency's ultimate conclusion that Munyakazi assisted or participated in the Rwandan genocide. Given that conclusion, the agency correctly determined that Munyakazi is barred from receiving asylum or withholding of removal.[10]

### III.

Munyakazi also challenges the agency's denial of his request for protection under CAT. "[O]ur standard of review is deferential to the BIA," and we review the denial of Munyakazi's claim for substantial evidence. Mulyani v. Holder, 771 F.3d 190, 200 (4th Cir. 2014). Thus, the "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude" otherwise. 8 U.S.C. § 1252(b)(4)(B). To establish relief under CAT, Munyakazi must show it is "more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture is relevantly defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally

---

[10] Munyakazi also raises a constitutional argument—that the DHS investigation violated his due process rights because he could not confront the witnesses. Munyakazi failed to raise this claim to the BIA, and that failure deprives us of jurisdiction to consider it. 8 U.S.C. § 1252(d)(1).

22

inflicted on a person." 8 C.F.R. § 1208.18(a)(1). Evidence of past torture is relevant under CAT, but "it does not create a presumption that an applicant will be tortured in the future." Suarez-Valenzuela v. Holder, 714 F.3d 241, 245 (4th Cir. 2013). Although Munyakazi is barred from receiving asylum or withholding of removal, that bar does not preclude the deferral of his removal under CAT. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). In addition, the agency is required to review "all the evidence relative" to a CAT claim and an adverse credibility finding "cannot alone preclude protection under the CAT." Camara v. Ashcroft, 378 F.3d 361, 372 (4th Cir. 2004).

The agency found that Munyakazi suffered harsh treatment during his previous incarceration, and that conditions in Rwandan military facilities may rise to the level of torture. However, the agency found that genocide perpetrators were held in civilian, not military, detention facilities and that conditions in those facilities, while harsh by American standards, do not amount to torture.[11]

---

[11] The agency relied on In re J—E—, 23 I&N Dec. 291 (BIA 2002), in concluding that Rwandan civilian prison authorities lacked the specific intent to inflict severe physical mental pain or suffering on civilian detainees. The BIA's decision in In re J—E— "requires a CAT claimant to demonstrate that the state actor who mistreats him desires to cause his severe pain and suffering, and is not merely negligent nor reckless as to the risk." Oxygene v. Lynch, 813 F.3d 541, 548 (4th Cir. 2016). In Oxygene, we held that the BIA's interpretation of CAT's
(Continued)

23

Again, our standard of review mandates that we deny Munyakazi's petition for CAT relief because substantial evidence supports the agency's findings and nothing in the record compels the opposite conclusion. The available documentary and testimonial evidence—including testimony from Munyakazi's own witness, Babonampoze—tended to establish that persons held on state security and terrorism charges were subjected to barbarous treatment[12] in military facilities but that persons charged with genocide crimes were held in civilian detention facilities. Likewise, the available State Department and United Nations documents indicated that conditions in civilian prisons do not rise to the level of torture. Munyakazi asserts that his charges are politically motivated and based on his status as a moderate, opposition Hutu. Even assuming he is correct, that does not change the fact that the actual charges pending against Munyakazi are not political crimes, but genocide crimes, and that genocide defendants are not held in military facilities.[13]

intent requirement is entitled to deference, and we see no error in its application here.

[12] For example, Babonampoze testified that he was beaten, placed in a hole underground while smoke was blown into it, and burned with fire. On another occasion he was tied to a pillar outside overnight in the cold.

[13] Munyakazi also discusses the local Gacaca tribunals— courts that were created specifically to deal with the multitude (Continued)

Munyakazi did not show that he is a member of the opposition UDF or that Rwanda is investigating him for opposition or terrorism activities. The record evidence does not compel the conclusion that Munyakazi will be held in a military detention facility. To the contrary, the record amply supports the agency's finding that Munyakazi is likely to be held in civilian prison and tried in civilian courts.

Accordingly, we conclude that substantial evidence supports the denial of Munyakazi's request for CAT protection.

IV.

For the foregoing reasons, Munyakazi's petition for review is denied.

PETITION DENIED

---

of genocide cases. Those courts, however, were closed in 2012 and the record does not show that Munyakazi would be before any Gacaca court.