**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4036

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MICHAEL SLAGER,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (2:16-cr-00378-DCN-1)

Argued: November 1, 2018                          Decided: January 8, 2019

Before WILKINSON, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Diaz joined.

**ARGUED:** Elizabeth Anne Franklin-Best, BLUME, FRANKLIN-BEST & YOUNG, LLC, Columbia, South Carolina, for Appellant. Elizabeth Parr Hecker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** John M. Gore, Acting Assistant Attorney General, Tovah R. Calderon, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

WYNN, Circuit Judge:

Defendant Michael Slager ("Defendant"), a former officer with the North Charleston Police Department, admitted that he "willfully" shot and killed Walter Scott ("Scott"), when Scott was unarmed and fleeing arrest. Defendant further admitted that his decision to shoot Scott was "objectively unreasonable." Based on those admissions, Defendant pleaded guilty to depriving Scott of his civil rights under color of law.

The district court sentenced Defendant to a 240-month term of imprisonment. Before this Court, Defendant argues that the district court reversibly erred in setting his sentence by: (1) using second-degree murder as the sentencing cross-reference for his offense rather than voluntary manslaughter, and (2) applying a two-level enhancement for obstruction of justice. Finding no reversible error, we affirm Defendant's sentence.

I.

A.

In May 2016, a federal grand jury in the District of South Carolina returned an indictment alleging, among other things, that Defendant, "while acting under color of law as an officer with the North Charleston Police Department, shot [and killed] Walter Scott without legal justification, willfully depriving him of the right . . . to be free from the use of unreasonable force by a law enforcement officer." J.A. 13. In the meantime, Defendant was tried in state court on one count of murder. That trial resulted in a hung jury and mistrial.

Thereafter, Defendant entered into a global plea agreement with the United States and the State of South Carolina. Under that agreement, in exchange for Defendant's guilty

2

plea in federal court to one count of depriving Scott of his civil rights under color of law, the United States agreed to drop the remaining counts of the indictment[1] and agreed to recommend a three-level reduction in the applicable sentencing level for acceptance of responsibility. Additionally, South Carolina agreed not to retry Defendant and dismissed the murder charge against him.

Some of the undisputed facts that formed the basis for Defendant's plea includes evidence showing that on the morning of April 4, 2015, while on duty, Defendant stopped Scott's vehicle after observing that his center brake light was not working. After the stop, Scott fled on foot and Defendant chased him. During the chase, Defendant shot his taser probes twice, hitting and bringing Scott down with the second shot. *See United States v. Slager*, No. 2:16-CR-00378-DCN, 2018 WL 445497, at *2 (D.S.C. Jan. 16, 2018).

At some point thereafter, Scott got up and fled. While Scott was unarmed and running away, Defendant drew his department-issued firearm and fired eight shots at Scott, five of which struck Scott in the back. Scott died on the scene from these wounds. *Id.*

A bystander witnessed and testified about the incident. The bystander also filmed parts of the incident. The bystander's testimony and video of the incident directly contradicted Defendant's initial account of the incident. In conformance with the global guilty plea agreement, Defendant admitted that he "used deadly force even though it was objectively unreasonable under the circumstances." *Id.* And, Defendant acknowledged

---

[1] The federal indictment charged Defendant with: depriving Scott of his civil rights under color of law, in violation of 18 U.S.C. § 242; using a weapon during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c); and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

3

that "his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids." *Id.*

## B.

Defendant's sentencing hearing began on December 4, 2017, and lasted four days. Because Defendant pleaded guilty to depriving Scott of his civil rights under color of law, the district court was required during sentencing to cross-reference the offense underlying the deprivation. *See* U.S.S.G. § 2H1.1(a)(1). The government contended that the proper cross-reference was second-degree murder because Defendant was acting with malice aforethought when he shot Scott. In contrast, Defendant argued that the proper cross-reference was voluntary manslaughter because he was provoked by Scott and was thus not acting with malice.

Although most of the facts were undisputed at Defendant's sentencing hearing, the government and Defendant disagreed as to what occurred *after* Scott fell to the ground, but *before* Scott got up and ran away from Defendant.

## i.

The government's version of events is based primarily on the only third-party eyewitness to the shooting, Feidin Santana. Santana recounted the shooting during a South Carolina Law Enforcement Division ("SLED") interview, and during Defendant's state and federal proceedings. Each time, Santana provided a consistent account of the shooting.

While traveling to work on the morning of the shooting, Santana saw Scott running from Defendant. Santana followed, but briefly lost sight of Scott and Defendant. When Santana next saw them, Scott was facing down, and Defendant was on top of Scott and

4

"trying to control" him. J.A. 971. Santana testified that it sounded like Scott was "being hurt" and he heard something "electric." J.A. 972. According to Santana, Defendant punched Scott in the back, but Scott never flipped over. Santana did not see Scott punch back. Nor did Santana see Scott grab the taser and charge toward Defendant. Indeed, Santana never saw Scott holding the taser. Rather, according to Santana, Scott did not seem to want to "hurt" Defendant but was "just trying to leave." J.A. 974. At some point, Scott shot up "aggressively," Santana testified. J.A. 975. By this, Santana meant that Scott was "determined to . . . just leave." *Id.* When Scott broke free and began to run, Defendant shot him. Defendant then handcuffed Scott and checked his pulse but did not treat him.

Santana also recorded a portion of the encounter with his cell phone. Santana's video does not clearly show the period during which Scott and Defendant were allegedly on the ground. But the video does show that Scott stood up and was running away—not pointing a taser at Defendant or advancing toward Defendant—when Defendant fired at him. Additionally, the video shows Defendant picked up the taser approximately ten feet behind the point where Defendant was standing when he shot Scott—not between Scott and Defendant.

ii.

In contrast to Santana's consistent recollection of the encounter, Defendant provided four different accounts as to what happened on the morning of April 4, 2015.

First, Defendant made an on-scene statement to his superior officer, Lieutenant Daniel Bowman, who arrived shortly after the shooting occurred. Defendant told Lt. Bowman that Scott continued to resist arrest after being tasered and falling to the ground.

5

Defendant tased Scott twice more while he laid on the ground, but Scott resisted and "was able to roll over onto his back." Supp. J.A. 75. Scott then "use[d] both hands to grab the taser" and after "a short struggle," Scott "was able to wrestle it away." *Id.* Scott then "stood up and pointed the taser at" Defendant. *Id.* Defendant told Lt. Bowman that, when faced with this alleged threat, he "drew his weapon as he was returning to the standing position and fired multiple times." *Id.* Several of Defendant's shots struck Scott, who then fell to the ground. According to this account, Defendant then "rendered emergency aid until other officers arrived seconds later." *Id.*

Three days after the shooting, on April 7, 2015, Defendant gave a second account of the encounter in an unsworn interview with SLED investigators. Before giving this statement, Defendant asked his attorney to verify with the SLED investigators whether there was "[a]ny video, surveillance video of businesses, security cameras, [or] anything" else documenting the shooting. J.A. 702. Defendant also asked whether there were any witnesses who viewed the shooting. The SLED investigators did not apprise Defendant of Santana or his recorded video.

At the start of the interview, the SLED investigators informed Defendant that the interview was part of a criminal investigation and that Defendant could decline to participate. Still, Defendant agreed to make a statement. Over the course of the interview, Defendant added new details not mentioned in his prior statement to Lt. Bowman and physically reenacted key aspects of the encounter. For example, Defendant claimed that Scott was "coming straight at him" holding the taser, with his "arm extending straight out." J.A. 1640. Defendant told the SLED investigators that he was "shuffle-stepping" to avoid

6

the taser as he "pulled his gun." *Id.* According to this account, Scott was "turning to his left" when Defendant fired. *Id.* Then, "Scott ran off, stumbled into the grass, [and] fell to the ground." *Id.* Defendant further told the investigators that "Scott must have dropped" the taser during this altercation, because he retrieved it "between the place where he had been shooting and where Scott landed." J.A. 1641.

During his state trial, Defendant provided a third description of his encounter with Scott. In this retelling, Defendant claimed that, during the alleged ground struggle, he had attempted to put Scott's left hand "behind his back to handcuff him." J.A. 282. However, Scott was in a "pushup position" and was "trying to get up" at the same time. *Id.* Defendant testified that while this was occurring, he and Scott were "fighting" and "rolling around on the ground." J.A. 285. According to this account, Scott eventually "overpowered" Defendant and took his taser. J.A. 286. Defendant testified that at that point, he "instructed Mr. Scott to turn right away and go, but he didn't." J.A. 288. Instead, Scott continued to approach Defendant, so Defendant "pulled [his] firearm" and "fired until the threat was stopped." J.A. 289. Defendant's testimony made clear that he was neither "provoked" nor "angry" during the shooting. J.A. 346–47. Instead, Defendant testified that he was simply "doing [his] job" and acting in "self-defense." *Id.* at 347.

Defendant provided his fourth description of the shooting over two days of testimony at his federal pre-trial hearings. Again, Defendant added new details. For the first time, Defendant testified that Scott "punched [him] in the chest" during the ground altercation. J.A. 732. And for the first time, Defendant testified that Scott was "on top of [him] at some point." J.A. 727. Defendant also testified—again, for the first time—that

7

Scott "drive stunned"[2] him during the altercation. J.A. 728. When asked why he had not previously provided these details, Defendant testified that the surrounding events were "fuzzy" and there were still "some things [he did not] recall." J.A. 727. But "some of [his] memory [had] come back since" the shooting, he testified. *Id.* Still, Defendant testified that he could not "recall *anything* [that he had] told SLED Agents" during his prior interview. J.A. 860 (emphasis added).

Defendant did not testify during his sentencing hearing, but he did attempt to buttress aspects of his final account of the encounter through three expert witnesses. First, Defendant offered Eugene Liscio, an expert forensic analyst who reconstructs crime scenes. Using Santana's video, Liscio created a 3D model of the scene of the encounter in an effort to determine whether Defendant or Scott was holding the taser prior to the shooting. Based upon the final position of the taser, Liscio opined that the video was "inconsistent" with Defendant throwing the taser with his right arm. J.A. 1257–58. However, Liscio equivocated as to this opinion, acknowledging that there was "no part in [the Santana video] where you can actually see the taser being held." J.A. 1275. Liscio also testified that, due to this limitation, the court would have to "make [its] own judgment call" as to what in fact occurred. J.A. 1279–80.

---

[2] "Tasers generally have two modes. In dart mode, a taser shoots probes into a subject and overrides the central nervous system. Drive stun mode, on the other hand, does not cause an override of the victim's central nervous system; that mode is used as a pain compliance tool with limited threat reduction." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 897 n.3 (4th Cir.), *cert. denied sub nom. Vill. of Pinehurst, N.C. v. Estate of Armstrong*, 137 S. Ct. 61, 196 L. Ed. 2d 32 (2016) (internal quotations marks and citations omitted).

8

Second, Defendant offered David Hallimore, a forensic audio analyst, who applied "filtration[s] to [the Santana Video] to allow the speech to become more clear." J.A. 1192, 1216. Through these filtrations and "critical listening"—a skill Hallimore purportedly learned by "train[ing his] brain effectively to better understand certain tones"—Hallimore testified that he heard "fuck police" and "Let go of the taser or I'll shoot" on the Santana video. J.A. 1204, 1216, 1218. But Hallimore also recognized this was his "interpretation" of the enhanced audio. J.A. 1220.

Finally, Defendant introduced opinions and analyses rendered by Megan Fletcher, an agent with the SLED's Trace Evidence Unit. Fletcher did not testify at the federal sentencing, but Defendant did reference her state trial testimony and report. Fletcher identified polyester fibers in Defendant's shirt that had been melted. Fletcher analyzed these fibers and opined that a "taser drive-stun cannot be excluded as a possible heat source which has the potential to melt polyester fibers." Supp. J.A. 89–90. But Fletcher averred that she was "unable to definitively conclude whether a Taser did or did not cause the marks on the uniform." Supp. J.A. 89. Fletcher also acknowledged that she never determined— and therefore did not know—the melting point of the fibers in Defendant's shirt.

C.

On January 16, 2018, the district court sentenced Defendant to a 240-month term of imprisonment. In an accompanying order explaining its sentencing decision, the court first determined that second-degree murder was the appropriate sentencing cross-reference for Defendant's offense because "malice aforethought is proven by a gross deviation from the standard of reasonable care, and [because] there is insufficient evidence that the defendant

9

acted in heat of passion." *Slager*, 2018 WL 445497, at *2. To support that judgment, the district court made extensive credibility determinations and factual findings.

To begin, the court assessed the credibility of the only two testifying eyewitnesses to Scott's shooting: Santana and Defendant. Recounting at length Defendant's various accounts of the encounter, the district court discredited Defendant's testimony, characterizing it as "contradictory," "self-serving, evolving, and internally inconsistent." *Id.* at *4–6. Furthermore, the court found that Defendant's experts did not bolster the credibility of his account because each expert *admitted* that his or her respective technique provided no definitive answer as to the key aspects of Defendant's final version of the encounter. In contrast, Santana presented a "consistent story," which the court found credible. *Id.* at *4 ("[A] review of the statement Santana gave to SLED, Santana's state court testimony, and his federal court testimony reveals a consistent story that is at odds with [Defendant's] presentation of the sequence of events . . . making Santana a more credible witness.").

Based upon these credibility determinations, the district court made the following findings of fact. First, the court found that the Santana video did not provide any grounds to support a finding of provocation. Second, the court found that the portion of the encounter not covered by the video—when Defendant and Scott were on the ground—also did not support a finding of provocation. In particular, the court found that Scott "yelled 'Fuck the police,' [and] that Scott ran away from [Defendant] during the initial traffic stop and disobeyed commands to stop." *Id.* at *8. But the court further found that—contrary to Defendant's statements—Scott was "never on top of [Defendant]." *Id.* The court found

10

that Scott did not wrestle the taser away and attempt to drive-stun Defendant because Scott "never had the taser in his hands." *Id.* Rather than coming straight at Defendant with a taser, Scott got "up from the ground [and] ran away from [Defendant]," the court found. *Id.* Instead "of giving chase once again, [Defendant] shot at Scott eight times" and "five of those shots hit Scott in the back." *Id.* Moreover, at "no point after [Defendant] fired the first shot—when Scott was nearly fifteen feet away—to when [Defendant] fired the eighth shot—when Scott was nearly forty feet away—did Scott turn around." *Id.* Emphasizing that "[w]ords alone will not suffice for a 'heat of passion' finding," the court concluded that these facts, "taken together," "did not constitute adequate provocation to apply the 'heat of passion' mitigation." *Id.*

In determining Defendant's sentence, the district court also applied a two-level sentencing enhancement for obstruction of justice based upon Defendant's false statements to the SLED investigators during his unsworn interview. U.S.S.G. § 3C1.1. In so doing, the court recognized that Defendant was "represented by an attorney" and "was aware that there was an investigation . . . underway for the shooting." *Id.* at *14. The court also emphasized that, before making the statement, Defendant specifically inquired "about the presence of a video that captured the shooting." *Id.* at *17. Believing that no video existed, Defendant "used the SLED interview to advance his false narrative of being forced to fire when Scott was coming toward him with a taser," the court explained. *Id.*

In deciding to apply the obstruction enhancement, the district court acknowledged that SLED had already obtained Santana's video when they interviewed Defendant. Still, without the video, some of Defendant's false statements would have significantly

11

obstructed the investigation, the court determined. Specifically, if it were "not for the Santana's video," Defendant's statement that "Scott was coming toward him with a taser at the time he fired his first shot" "would certainly have hindered the investigation." *Id.* This was especially true because Defendant's "status as a [law enforcement] officer would likely have meant that his rendition of the events would not have been immediately questioned." *Id.*

Defendant timely appealed his sentence.

## II.

## A.

When, as here, a defendant is sentenced for deprivation of civil rights under color of law, the Sentencing Guidelines require the court to cross-reference the "offense guideline applicable to any underlying offense." U.S.S.G. § 2H1.1(a)(1).

Defendant first argues that the district court erred by determining that second-degree murder was the proper cross-reference under Section 2H1.1. Specifically, Defendant claims that when he shot Scott, he was provoked and thus acting without malice. Consequently, Defendant argues that the proper cross-reference was voluntary manslaughter, not second-degree murder.

At sentencing, the government "has the burden to prove a cross-referenced offense by a preponderance of the evidence[.]" *United States v. Davis*, 679 F.3d 177, 182 (4th Cir. 2012). In reviewing "whether a district court properly applied . . . its application of a cross-reference, we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Ashford*, 718 F.3d 377, 380 (4th Cir. 2013)

(quoting *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009)) (internal quotation marks omitted). For the reasons that follow, we hold that the district court did not clearly err in making its factual findings. We further conclude that the court correctly determined, based on those findings, that second-degree murder was the proper cross-reference.

i.

"When sentencing courts engage in fact finding, preponderance of the evidence is the appropriate standard of proof." *United States v. Span*, 789 F.3d 320, 334 (4th Cir. 2015) (citations and alterations omitted). We "will not reverse a lower court's findings of fact simply because we would have decided the case differently." *Id.* (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). Instead, clear error exists only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Easley*, 532 U.S. at 242).

When a district court renders factual findings "based on determinations regarding the credibility of witnesses, we give even greater deference to the trial court's findings." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)) (internal quotation marks omitted); *see also Teleguz v. Zook*, 806 F.3d 803, 812 (4th Cir. 2015) ("[C]redibility determinations are deserving of the highest degree of appellate deference."), *cert. denied*, 137 S. Ct. 95 (2016). Indeed, if a district court's finding "is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575 (1985).

Because Santana's video does not capture the entirety of the disputed period, the court based many of its factual findings on its assessment of the credibility of the two testifying eyewitnesses to the encounter: Defendant and Santana. Examining at length each of Defendant's four accounts of the encounter, the court discredited Defendant's testimony as "contradictory," "self-serving, evolving, and internally inconsistent." *Slager*, 2018 WL 445497, at \*4–6. The record amply supports that credibility determination.

Each time Defendant provided a new statement about the shooting, he put forward new details materially bearing on his application of force. For example, in contrast to his testimony in these proceedings, Defendant never told Lt. Bowman or the SLED investigators that Scott was "on top of [him] at some point" during the disputed period. J.A. 727–28. Also, in contrast to his testimony in these proceedings, Defendant did not tell Lt. Bowman or the SLED investigators that he was "drive stunned" by Scott. *Id.* And in contrast to his testimony in these proceedings, Defendant did not tell either Lt. Bowman or the SLED investigators that Scott "punched [him] in the chest." J.A. 732. When Defendant was asked why he previously failed to provide these details, he testified that his memory was "fuzzy" and he *still didn't* "recall" "some things." *Id.* Defendant's "evolving" account of the encounter provided the district court with ample factual basis to discredit Defendant's testimony. *See Munyakazi v. Lynch*, 829 F.3d 291, 298 (4th Cir. 2016) ("Omissions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination." (internal quotation marks and alterations omitted)).

14

That some of Defendant's assertions are flatly contradicted by Santana's video and by Defendant's own plea agreement further supports the district court's finding that Defendant's account was not credible. *Id.* Santana's video, for example, shows that when Defendant fired eight shots from his firearm, Scott was "running away, not pointing a Taser at [Defendant] or advancing toward him," contrary to Defendant's statement to Lt. Bowman and the SLED investigators. *Slager*, 2018 WL 445497, at *6. And the video reveals that Defendant picked up his taser approximately ten feet *behind* where Defendant stood when he shot Scott—not between Scott and Defendant, as Defendant initially asserted. These contradictions further demonstrate that the district court did not clearly err in discerning Defendant's testimony. *See United States v. Savage*, 885 F.3d 212, 220 (4th Cir. 2018) (holding that it is for the factfinder to hear a witness's "testimony, along with any alleged inconsistencies, and decide[] [whether] testimony [is] credible").

Santana, on the other hand, provided a consistent story, including as to the facts the district court found significant in its sentencing opinion. Each time he was questioned, Santana testified that Scott never was on top of Defendant, always was facing down, never gained control of Defendant's taser, and never charged at or tried to fight with Defendant. And each time he was questioned, Santana testified that once Scott was able to stand up, he began to flee—that Scott never tried to stay and fight Defendant, much less charge at him, as Defendant claimed.

Additionally, unlike several of Defendant's retellings of the encounter, Santana's version of events is—and always has been—consistent with the recorded video. On these facts, the district court did not clearly err in crediting Santana's consistent testimony. *See*

15

*United States v. Stark*, 8 F.3d 822 (4th Cir. 1993) (unpublished opinion) (District court did not clearly err in finding one witness's "consistent testimony, substantiated in part by [documentary evidence], was more credible than [another witness's] testimony, which the court found inconsistent and incredible in many respects.").[3]

Defendant nevertheless claims that the district court reversibly erred in declining to find that the testimony of Defendant's expert witnesses rendered Defendant's account of the encounter credible. "As with lay witnesses, evaluating the credibility of experts and the value of their opinions is also a function best committed to the district courts, and one to which appellate courts should defer[.]" *Hall*, 664 F.3d at 462 (citations and alterations omitted).

Here, the court did not reversibly err by declining to give weight to the testimony and evidence presented by Defendant's experts. The district court emphasized—as the record demonstrates—that each expert *admitted* their respective techniques could not provide the court with definitive conclusions as to what happened during the disputed period. Instead, the experts couched their opinions with statements of equivocation and invited the court to make its own judgment as to what, in fact, occurred during the disputed period. *See, e.g.,* Supp. J.A. 89–90 (Fletcher opining that a taser "drive-stun *cannot be excluded* as a *possible* heat source which has the potential to melt polyester fibers"); J.A.

---

[3] Defendant complains that the district court failed to point out in its sentencing order that Santana viewed the shooting "from a distance of 136–180 feet." Appellant's Br. at 16. Although we "do not dispute that there must be sufficient explanation for a sentence to be procedurally reasonable," the court's "thorough explanation" here was more than sufficient to meet this burden. *United States v. Helton*, 782 F.3d 148, 154 (4th Cir. 2015).

1279–80 (Liscio testifying that the district court could not rely on his recreation of the scene, but instead "ha[d] to make your *own judgment call*," to determine whether Scott ever held the taser); J.A. 1220 (Hallimore offering the court an "*interpretation*" of the enhanced audio). The district court thus did not reversibly err in choosing not to give weight to these equivocal opinions.[4]

In sum, the district court did not clearly err by crediting Santana's version of the encounter—including that Scott was "never on top of [Defendant]," that Scott never had the taser in his hands, that Scott immediately began to run away when he stood up, and that he was running away when Defendant shot him, *Slager*, 2018 WL 445497, at *8—as opposed to Defendant's (most recent) account. Notably, several of these key factual determinations are consistent with the facts Defendant admitted to in his plea agreement. *See, e.g., id.* at *2 (Defendant "fired multiple shots at Scott while Scott was *running away* from him."); *id.* ("[D]efendant's Taser dropped to the ground *behind* [D]efendant.").

---

[4] Defendant also relies upon the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to argue that the court erred by failing to give weight to Fletcher's opinions. But the Rules of Evidence do not apply to sentencing. Fed. R. Evid. 1101(d)(3). And this Court has not applied *Daubert* to sentencing hearings. *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000); *see also United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007) ("No Circuit that we are aware of has applied *Daubert* to sentencing. . . . Since *Daubert*'s holding was based on the Federal Rules of Evidence, it is not directly applicable."). Applying *Daubert* would run contrary to the sentencing court's "wide discretion" to determine the "sources and types of evidence," which are relevant for defendants' individualized sentencing. *Pepper v. United States*, 562 U.S. 476, 488 (2011). We thus reject Defendant's *Daubert* argument.

## ii.

Defendant next contends that the district court's factual findings do not support a finding of malice aforethought. Consequently, Defendant maintains that the court erred by determining the proper cross-reference was voluntary manslaughter, not second-degree murder. Again, we disagree.

Murder is "the unlawful killing of a human being with malice aforethought," 18 U.S.C. § 1111, whereas voluntary "manslaughter is the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion," 18 U.S.C. § 1112(a). In other words, malice aforethought "is the distinguishing characteristic which, when present, makes a homicide murder rather than manslaughter." *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984).

"Malice aforethought may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a [factfinder] is warranted in inferring that [the] defendant was aware of a serious risk of death or serious bodily harm." *Ashford*, 718 F.3d at 384 (citations and alterations omitted). Malice does not "require proof of an intent to kill or injure." *Fleming*, 739 F.2d at 947 (citations omitted). Malice exists when the evidence demonstrates that the defendant acted "with a heart that was without regard for the life and safety of others." *Id.* at 948 (citations omitted). A district court may infer malice when a defendant uses a weapon "in such a manner as may be expected naturally and probably to cause death." *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir. 1975); *accord United States v. Wright*, 594 F.3d 259, 268 (4th Cir. 2010) (finding malice when Defendant "engaged in a 'reckless firing of the

18

firearm, a random firing *with the intent to hurt someone*'" (emphasis in original)); *Ashford*, 718 F.3d at 384 (finding malice when Defendant "drew his firearm and pursued the fleeing" victim).

As Defendant sought to do here, a defendant may negate a finding of malice by demonstrating that an intentional killing occurred "upon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a); *United States v. Velazquez*, 246 F.3d 204, 212 (2d Cir. 2001); *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989); *United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993); *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir. 1987). Federal courts apply the common-law meaning of "sudden quarrel or heat of passion." *See, e.g., United States v. Martinez*, 988 F.2d 685, 694 (7th Cir. 1993). Under the common law, a defendant's "heat of passion" must arise from "adequate provocation." *See id.*; *Roston*, 986 F.2d at 1291; *United States v. Collins*, 690 F.2d 431, 437 (5th Cir. 1982); *United States v. Medina*, 755 F.2d 1269, 1272 (7th Cir. 1985); *United States v. Paul*, 37 F.3d 496, 498 (9th Cir. 1994). Provocation is adequate when it "would arouse a reasonable and ordinary person to kill someone." *United States v. Wagner*, 834 F.2d 1474, 1487 (9th Cir. 1987); *see Velazquez*, 246 F.3d at 213. When a law enforcement officer, like Defendant, seeks to rely on a sudden quarrel or heat of passion defense, a court must assess the adequacy of the provocation "by the standards of a reasonable officer." *See Velazquez*, 246 F.3d at 213 (citing *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1999)).

"[M]ere words" generally provide inadequate provocation to negate a finding of malice. *See Allen v. United States*, 164 U.S. 492, 497 (1896); *Velazquez*, 246 F.3d at 213;

19

*United States v. McRae*, 593 F.2d 700, 705 (5th Cir. 1979); s*ee also* 3 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 15.2(b)(6) (3d ed. 2018) (detailing extraordinary, but inapposite exceptions); *Cobb*, 905 F.2d at 789 ("mere words" cannot "justify the use of physical force by a police officer"). By contrast, "[m]utual combat" can constitute adequate provocation under some circumstances. *See Martinez*, 988 F.2d at 696; *United States v. Hardin*, 443 F.2d 735, 738–39 (D.C. Cir. 1970); 3 LaFave at § 15.2(b)(2). But when a victim is fleeing from combat and the defendant is neither angry nor in danger, mutual combat does not support a finding that a defendant acted in a heat of passion. *See Ashford*, 718 F.3d at 380 ("[T]he 'heat of passion' mitigator plainly does not apply to an aggressor who is 'not angry,' and has multiple opportunities to walk away from a dispute that he incited.").

In this case, the district court did not reversibly err in determining that the facts supported a finding of malice. In his plea agreement, Defendant admitted that he acted "voluntarily and intentionally with specific intent to do something the law forbids." *Slager*, 2018 WL 445497, at *2. Additionally, Defendant admitted that he "fired eight shots at Scott, and each of those eight shots were fired while Scott was unarmed and running away." *Id.* Defendant's voluntary, intentional, and repeated discharge of his firearm at Scott as he attempted to run away "may be expected naturally and probably to cause death." *Celestine*, 510 F.2d at 459; *Cf. Wright*, 594 F.3d at 268 (It is "perfectly foreseeable that someone w[ill] be killed" when firing a gun "with intent to hurt someone.").

Nor did the district court err in determining that Defendant's malice was not negated by "sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). Even though Scott yelled

20

"Fuck the police" prior to the shooting, the court rightly found that these words were insufficient to provoke a reasonable officer—or any reasonable person—to kill. *Slager*, 2018 WL 445497, at *8; *see Velazquez*, 246 F.3d at 207 (holding that prisoner yelling "Fuck you, you are not going to tell me what to do" was insufficient to provoke guards to kill in the "heat of passion").

Additionally, Defendant's alleged *mutual* combat with Scott did not provide Defendant with adequate provocation because Scott was *running away* when Defendant shot him. *See Ashford*, 718 F.3d at 380. Perhaps most importantly, even though Defendant now claims he was provoked, Defendant testified at his state proceedings that he was neither "provoked" nor "angry" during his altercation but was merely acting in "self-defense." J.A. 346–47.[5] Defendant cannot negate his malice through "sudden quarrel or heat of passion" when he previously testified he was neither "provoked" nor "angry." *Ashford*, 718 F.3d at 380.

In conclusion, the district court did not reversibly err by inferring Defendant's malice from the facts it found credible. Moreover, the court did not reversibly err by determining that Defendant's malice was not negated by "sudden quarrel or heat of passion." Accordingly, the court properly cross-referenced second-degree murder.

---

[5] Because Defendant admitted in his plea agreement that he acted "willfully," the district court found that Defendant was foreclosed from arguing self-defense during his federal sentencing hearing. *Slager*, 2018 WL 445497, at *2.

21

B.

Next, Defendant argues that the district court erred in applying a two-level sentence enhancement for obstructing justice based on Defendant's false statements to SLED. Defendant raises this issue for the first time on appeal. "Because this issue was not advanced in the district court, we review the district court decision for plain error." *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005); *see United States v. Brack*, 651 F.3d 388, 392 (4th Cir. 2011). For an error to be "plain," it must be "obvious or clear under current law." *Brack*, 651 F.3d at 392. Under this circumscribed standard of review, we do not find that the district court plainly erred by applying the obstruction sentencing enhancement.

A sentencing court may apply the obstruction enhancement when a defendant: (1) "willfully obstructed or impeded, or *attempted* to obstruct or impede, the administration of justice with respect to the investigation . . . of the instant offense of conviction," and (2) "the obstructive conduct related to the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1 (emphasis added). Defendant argues that the district court plainly erred in applying this enhancement because Defendant's false statements to the SLED investigators "were not made under oath" and the SLED investigators already had Santana's video when they interviewed Defendant, meaning that Defendant's false statements "did not significantly impede the official investigation." Appellant's Br. at 45.

In support of his argument, Defendant emphasizes that the comments to the obstruction guideline state "*[o]rdinarily . . .* making false statements, *not under oath* to law enforcement officers"—as was the case here—does not warrant application of the

22

enhancement. U.S.S.G. § 3C1.1 cmt. n.5 (emphases added). But the comments further state that "providing a materially false statement to a law enforcement officer that *significantly* obstructed or impeded the official investigation" does warrant application of the enhancement, regardless of whether the materially false statement was made under oath. *Id.* cmt. n.4(G) (emphasis added). And the express text of the obstruction guideline covers "attempted" obstruction of justice, indicating that application of the guideline is appropriate, at least in some circumstances, even when a defendant's attempted obstruction did not in fact result in the obstruction of an investigation. *Id.*

Accordingly, Section 3C1.1 and its comments do not clearly answer the relevant question: whether an *attempt* to *significantly* obstruct an investigation through unsworn statements warrants application of the enhancement. Nor has this Court's case law provided an "obvious" or "clear" answer to that question. *Hughes*, 401 F.3d at 547. Notably, as to that question, our sister circuits have reached divergent answers. *Compare United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) (enhancement can be appropriate based upon attempted, but significant obstruction); *United States v. Wolverine*, 584 F. App'x 646, 649 (9th Cir. 2014) (same); *with United States v. Adejumo*, 772 F.3d 513, 529 (8th Cir. 2014) (enhancement is inappropriate based upon attempted, but significant obstruction); *United States v. Griffin*, 310 F.3d 1017, 1022–23 (7th Cir. 2002) (same). In such circumstances, Defendant cannot meet his burden to show that the district court *plainly* erred by applying a two-level sentencing enhancement for attempted, yet

23

significant, obstruction of justice through unsworn statements to law enforcement investigators. [6]

## III.

In sum, the district court committed no reversible error in sentencing Defendant. First, the district court did not clearly err in crediting Santana's description of the encounter and discrediting Defendant's description. Second, the court properly inferred, from these facts, malice as required for a second-degree murder cross-reference. Finally, the district court did not plainly err in applying an obstruction of justice enhancement. Accordingly, the district court's sentence is

*AFFIRMED.*

---

[6] Defendant also objects to his federal prosecution on double jeopardy grounds. Acknowledging that current Supreme Court case law forecloses this argument, Defendant preserves it pending a possible change in the law.